Coreta FENNER and Joann Callaman, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

BRUCE MANOR, INC., a Maryland Corporation, et al., Defendants.

Brenda PARKS and Patricia Tolliver, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

R. Walter WARD et al., Defendants.

Frances D. HARRIS and George Young, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

BYWATER MUTUAL HOMES, INC., et al., Defendants.

Civ. Nos. H–74–858, H–74–859 and H–75–95.

United States District Court, D. Maryland.

March 22, 1976.

Gerald R. Walsh and Kenneth J. Pilla, Legal Aid Bureau, Inc., Baltimore, Md., and John C. Eidleman and Elloyd E. Lotridge, Legal Aid Bureau, Inc., Annapolis, Md., for plaintiffs.

Michael Rose, Dept. of Justice, Washington, D. C., and Virginia S. Draper, Asst. U. S. Atty., Baltimore, Md., for federal defendants.

Alfred H. Kreckman, Jr., Baltimore, Md., for defendants Bruce Manor, Inc. and Realty Investment, Inc.

Bayard Z. Hochberg, Baltimore, Md., and Cypert O. Whitfill, Bel Air, Md., for defendants R. Walter Ward, Melvin Boseley, Meadowood Associates, Ltd. and Ward and Boseley Co., Inc.

Neal D. Peterson, Washington, D. C., and Joseph A. Finlayson, Jr., Hillcrest Heights, Md., for defendants Bywater Mutual Homes, Inc., Tuskegee Realty Company, Alfred E. Matthews, Leroy Washington, Alma Cropper and Rick Perry.

HARVEY, District Judge:

In each of these three civil actions, the plaintiffs and the members of the class they represent are tenants in certain housing projects owned and operated by private entities ("the private defendants") and regulated by the Secretary of the Department of Housing and Urban Development ("HUD") and his delegates ("the federal defendants") under various provisions of the National Housing Act.[1] In each case, the plaintiffs have sued their landlord and the federal defendants, seeking declaratory, injunctive and related relief.

The plaintiffs' principal complaint asserted in all three cases is that the private defendants increased their rents and HUD approved such increases without giving plaintiffs prior notice and an opportunity to be heard. In asserting

---

1. 12 U.S.C. § 1701 et seq.

this claim and various others discussed more fully hereinafter, plaintiffs rely on the due process and equal protection clauses of the United States Constitution, on provisions of the National Housing Act and HUD regulations promulgated thereunder and on various provisions of the Maryland Rent Control Act.[2] Plaintiffs ask that this Court declare that the rent increases in question are illegal in the absence of prior notice and an appropriate hearing, that this Court declare certain provisions in their leases to be unreasonable and require HUD to promulgate new leases, that this Court enjoin the private defendants and the federal defendants from increasing rents or approving such increases without prior notice and a hearing, and that this Court order an accounting and a return of the increases paid by plaintiffs since they were put into effect. Jurisdiction is asserted under 28 U.S.C. §§ 1331(a) and 1337.[3]

Each case presents similar legal questions in a slightly different factual context. A § 221(d)(3) housing project is involved in Civil No. H–74–858, Civil No. H–74–859 pertains to a privately-owned § 236 project, and Civil No. H–75–95 involves a § 236 project owned by a co-operative corporation.

Presently before the Court are cross motions for summary judgment filed by the plaintiffs and by the federal defendants and private defendants. The essential facts have been stipulated, and extensive briefs have been filed by the parties. Although these cases were not consolidated under Rule 42(a) of the Federal Rules of Civil Procedure, argument on all motions in all cases was heard at the same time.

### The Fenner Case—Civil No. H–74–858

In this particular action, the plaintiffs seek relief on behalf of a class of tenants who reside at Bruce Manor Apartments, a low-to-moderate income housing project located in the City of Baltimore. The mortgage on the apartment property is insured by the Federal Housing Administration (FHA) under § 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715l(d)(3), and the named defendants are various HUD officials as well as Bruce Manor, Inc., the owner, and Realty Investment, Inc., the management agent.

The National Housing Act was first enacted in 1934, and since then Congress has provided various forms of federal assistance to housing. Like other provisions of the Act, § 221 is designed to assist private industry in providing housing for low and moderate income families and displaced families. 12 U.S.C. § 1715l(a). A § 221 housing program (and also a § 236 program) is administered by the FHA. Originally created in 1934, the stated purpose of the FHA is to encourage improvement in housing standards and conditions, to provide an adequate home financing system by insurance of mortgages and credit, and to exert a stabilizing influence on the mortgage market. See 24 C.F.R. § 200.3. However, the FHA does not make direct loans or build housing; it merely operates insurance programs under the provisions of the Act. 24 C.F.R. § 200.5.

Insofar as a § 221(d)(3) project is concerned, FHA provides insurance on mortgage loans which cover up to 90% of a project's cost, thereby encouraging private investment in what might otherwise be considered a risky venture. Eligible borrowers such as Bruce Manor can also obtain below-market interest rates, thus reducing the amount of the rentals necessary to service the landlord's debt obligations. 12 U.S.C. § 1715l(d)(5). To be eligible to receive these benefits, a project owner must agree to regulation and supervision "by the Secretary under a regulatory agreement or otherwise, as

---

**2.** § 45, Art. 53, Md.Ann.Code (1972 Repl.Vol.) and § 8–209, Real Property Art., Md.Ann.Code (1974 Suppl.). See Chapter 794 of the Acts of 1973 and Chapter 741 of the Acts of 1974.

**3.** In the *Fenner* case, jurisdiction was challenged. In denying the private defendants' motion to dismiss, this Court ruled that jurisdiction existed both under 28 U.S.C. § 1337 and under 28 U.S.C. § 1331(a).

to rents, charges, and methods of operation, in such form and in such manner as in the opinion of the Secretary will effectuate the purposes of this section . . . ." 12 U.S.C. § 1715*l*(d)(3).

As empowered to do, the Secretary has implemented § 221 by promulgating extensive regulations, which appear at 24 C.F.R. § 221.1 *et seq.* Pursuant to these provisions, HUD regulates the landlord's return on investment, 24 C.F.R. § 221.-531(b), and in the case of a "limited distribution mortgagor" such as Bruce Manor, the rate of return is limited to 6% per annum on the initial equity investment as determined by the Secretary. 24 C.F.R. § 221.532(a). In deciding whether to approve an application submitted by a landlord for an increase in rent, the Secretary is required by the regulations to consider: "(1) Rental income necessary to maintain the economic soundness of the project; and (2) Rental income necessary to provide a reasonable return on the investment consistent with providing reasonable rentals to tenants." 24 C.F.R. § 221.531(c).

Pursuant to 24 C.F.R. § 221.529, the Secretary entered into a Regulatory Agreement with Bruce Manor, providing in pertinent part as follows:

4. The owners covenant and agree that:

 \* \* \* \* \* \*

e. They shall require all tenants to execute a lease in the form prescribed by the Commissioner, and shall not rent any unit in the project for less than 30 days nor more than one year;

f. The rent charged for each unit shall not exceed the upper limit of the range shown for such type of unit on the rental schedule approved in writing by the Commissioner, and shall include the reasonable use of all utilities shown on said schedule, but in no event shall the total gross monthly rents for all dwelling units exceed the gross monthly dwelling income for all units approved by the Commissioner on the rental schedule;

g. No increase will be made in the amount of the gross monthly dwelling income for all units as shown on the rental schedule unless such increase is approved by the Commissioner, who will at any time entertain a written request for an increase properly supported by substantiating evidence and within a reasonable time shall:

(1) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance expenses over which Owners have no effective control, or

(2) Deny the increase stating the reasons therefor.

Plaintiff Coreta Fenner and the members of the class she represents are tenants at Bruce Manor Apartments. They have low incomes and therefore qualify for rentals in amounts less than the fair market rent for their respective apartments. On April 1, 1974, plaintiffs were notified by the private defendants that their rents would be increased from $141 to $152 per month, effective May 1, 1974. Plaintiffs assert that they were not notified of the private defendants' intention to seek approval of these rent increases, that they were not given an opportunity to review this request for a rent increase, that they were not permitted to comment on, object to or test the reasonableness of this request and that the federal defendants did not notify them of the reasons for approving the requested increases in rent. Defendants do not deny these allegations.

The request for a rent increase at Bruce Manor Apartments was submitted on February 7, 1974 to Eugene R. Henderson, Director of the Housing Management Division for HUD's Baltimore Area Office. The request was preliminarily approved on February 28, 1974, contingent upon the Area Office's receiving

from Bruce Manor and approving certain additional information. The information requested was duly submitted and extensively reviewed by the Area Office. Final approval for the increase was given on April 19, 1974. Mr. Henderson determined that, because of projections of increased costs due to increases in real estate taxes and electricity and gas rates, an 8% rent increase was the minimum necessary for Bruce Manor to meet its debt service and operational expenses. Even with such increase, the rental income received was insufficient to prevent a default by project owners on their mortgage. Such mortgage is now under a Modification Agreement whereby principal reduction payments and payments to a reserve fund for replacements have been abated for a period of one year, ending March 31, 1976. The project was in default under the Modification Agreement in April, May and June of 1975.

### The Parks Case—Civil No. H–75–859

This class action has been brought on behalf of residents of Meadowood Townhouses, a project located in Harford County, Maryland. Named as defendants are R. Walter Ward and Melvin Boseley, partners of Meadowood Associates, Ltd., owner, and Ward and Boseley, Inc., management agent of the project, as well as the same federal defendants as in the *Fenner* case. Meadowood is a low-to-moderate income housing project financed under § 236 of the National Housing Act, 12 U.S.C. § 1715z–1.

One of the purposes of § 236, which was added to the Act in 1968, was to provide federal financing to assist private owners of rental housing projects designed for occupancy by lower income families. 12 U.S.C. § 1715z–1(a). The statute provides for mortgage insurance and authorizes HUD to make periodic interest reduction payments directly to a mortgagee on behalf of a private owner in an amount not to exceed the sum necessary to reduce the effective interest rate payments to 1%. 12 U.S.C. § 1715z–1(c). The savings to the owner realized by this interest subsidy are to be

passed along to tenants in the form of reduced rentals. The rent to be charged must be established with the approval of the Secretary and must be at a so-called "basic rental charge", as defined in the statute, or at such greater amount not exceeding "the fair market rental charge" as represents 25% of the tenant's income. 12 U.S.C. § 1715z–1(f). So that HUD may properly administer the program, Subsections (e) and (h) confer the following broad discretion on the Secretary (12 U.S.C. § 1715z–1(e) and (h)):

> (e) As a condition for receiving the benefits of interest reduction payments, the project owner shall operate the project in accordance with such requirements with respect to tenant eligibility and rents as the Secretary may prescribe. Procedures shall be adopted by the Secretary for review of tenant incomes at intervals of two years (or at shorter intervals where the Secretary deems it desirable).

> \* \* \* \* \* \*

> (h) In addition to establishing the requirements specified in subsection (e) of this section, the Secretary is authorized to make such rules and regulations, to enter into such agreements, and to adopt such procedures as he may deem necessary or desirable to carry out the provisions of this section.

These Subsections have been implemented by the promulgation of regulations generally similar to those set forth hereinabove with respect to § 221(d)(3) projects. 24 C.F.R. § 236.1 *et seq.* Moreover, HUD and the private defendants in this case executed a Regulatory Agreement containing provisions similar to those which control in the *Fenner* case.

Plaintiff Brenda Parks and the members of the class she represents are low-income tenants at the Meadowood Townhouses project. Their complaint makes essentially the same claims as those contained in the complaint filed in the *Fenner* case. However, the *Parks* plaintiffs seek to invalidate two separate rent in-

creases. Although papers filed following final argument in these cases indicate that some of the facts pertaining to these increases have not been agreed upon, the facts material to a proper consideration of the claims presented by the *Parks* complaint are not in dispute.

On May 24, 1974, private defendants informed tenants by letter that rents would be increased effective July 1, 1974, plaintiff Parks' from $127 to $133 and plaintiff Tolliver's from $95 to $133 per month. Private defendants had filed an application with HUD on April 16, 1974, seeking approval of the increase, and the increase was put into effect on July 1, 1974. Although it does not appear that final approval had been received from HUD prior to July 1 because certain additional information had not been received before then, the record does show that HUD later received the information and gave its final approval for the increase which had become effective on July 1, 1974.[4]

On September 20, 1974, the private defendants applied for permission to increase the rent a second time and for permission to require that tenants pay utility expenses directly.[5] The request to increase rents was processed and approved on September 30, and the utility pass-through was approved October 18. These changes were put into effect by the private defendants on November 1, 1974. The basic rental for Section I apartments was to be reduced from $133 to $109 per month, but tenants would be required to pay their own utilities, which had averaged $44 per month.[6] Thus, an average tenant would be paying $153 per month after October 18, 1974 for rent and utilities, as compared to $133 per month before that date.

■ For the first time in their final reply brief, plaintiffs suggest that both increases are invalid because HUD did not comply with its own regulations in approving them. It is argued that the first increase was not approved by HUD before it was made effective by the landlord and that the second increase was approved by HUD before the necessary forms supporting the application had been fully completed. Such contentions were made too belatedly to be considered in this litigation.[7] No such claims were presented by the complaint, and no mention of such grounds of invalidity was made in the original briefs filed by the parties.[8] Thus, the claims which will be considered in the *Parks* case will be only those presented in the other two cases. The essential facts pertaining to plaintiffs' claims that they were entitled to prior notice and a hearing are not disputed. Plaintiffs assert and defendants do not deny that the tenants at the Meadowood Townhouses project received no notice of the private defendants' intention to apply for the rent increases or utility pass-throughs

---

4. At one point, HUD suggested that increased rents received after July 1 and before September 11 should be refunded to tenants. This suggestion was withdrawn when final approval was later given, because Mr. Henderson concluded that the financial status of the project was so bad that it should not be placed in "further financial jeopardy."

5. Previously, the landlord had paid all utility charges, and the rent paid by a tenant had included these expenses. The change sought by the landlord in each of the *Parks* and *Harris* cases has been referred to by the parties as a "utility pass-through."

6. The utility pass-through as approved apparently resulted in the payment by plaintiffs Parks and Tolliver of less than the average $44 per month. Their actual utility bills for the period from November 1, 1974 to March 27, 1975 had ranged from a low of $20.95 per month to a high of $42.11 per month.

7. Final argument in these cases was held on September 5, 1975. At the request of the Court, the federal defendants thereafter filed an additional memorandum and affidavit. The plaintiffs requested and were granted the right to reply to this memorandum and affidavit, but in their final reply brief they also raised these new issues for the first time. The defendants have therefore had no opportunity to respond to these new arguments.

8. At no time have plaintiffs sought leave to amend their complaint. Furthermore, the pertinent facts as to these new issues, which appear to be disputed, have not been developed through discovery procedures.

and no opportunity to inspect the documents submitted to HUD in support of the applications or to contest the increases before HUD approved them.

*The Harris Case—Civil No. H–75–95*

This class action has been brought on behalf of the member-tenants of Bywater Mutual Homes, Inc., a cooperative housing corporation, which owns a housing project in Annapolis, Maryland. Like the project in the *Parks* case, this one is financed under § 236 of the Act. Named as defendants are the corporation itself, members of its Board of Directors and Tuskegee Realty Company, management agent for the project. The federal defendants are the same as in the other two cases.

The Bywater Mutual Homes project is regulated under the same statutory provisions and HUD regulations as is Meadowood Townhouses. A similar Regulatory Agreement as described herein was executed by the owner and HUD. The differences in the applicable regulations, which result from the fact that the owner is a cooperative housing corporation, are not material here.

On September 25, 1973, representatives of the project requested approval of rent increases in Sections I and II and approval of a utility pass-through in Section II.[9] Although HUD approved the changes by letter of Mr. Henderson dated November 21, 1973, they were not put into effect until several months later. Bywater had held its first election of member-tenants to the Board of Directors on September 27, 1973. On February 11, 1974, the Board of Directors adopted a new budget based on the changes approved in Mr. Henderson's letter of November 21, 1973. Tenants were notified on February 20, 1974 that their rents would be increased effective April 1, 1974.[10]

In spite of these increases and change in terms, the project's revenues were still insufficient to enable it to meet its mortgage obligations, partly because many tenants were unable to keep up their rent payments. Accordingly, the Board of Directors authorized its agent to request approval of another rent increase of approximately $20 per unit and also to request an abatement of principal payments and a reduction of interest charges on its mortgage. These requests were made in September 1974 and were later approved by HUD.

The plaintiffs in the *Harris* case assert claims similar to those in the other two cases. They contend that they received no notice of the private defendants' intention to apply for the changes, that they had no opportunity to review the applications, analyze the data upon which they were based and object to the proposed changes, and that they were not advised of the reasons for the changes. Defendants do not deny these allegations. In addition to arguing, as they have in the other two cases, that tenants in federally-assisted housing projects are not entitled to the notice and hearing sought by plaintiffs, defendants point out that the plaintiffs are members and owners of the defendant, Bywater Mutual Homes, Inc., a cooperative housing corporation. Defendants assert that plaintiffs therefore have the right and duty to participate in the management of the landlord's business affairs through election of and communication with its Board of Directors. They further point out that the notice to tenants dated September 26, 1974 explained the necessity for the second increase and encouraged members to attend a general membership meeting on September 28, 1974. However, defendants do not deny that each individual member-tenant received no prior notice of the second application submitted to HUD and had no opportunity to comment on the proposed increase before it became effective.

*Questions Presented*

Plaintiffs advance eight separate grounds for relief in these cases. They

---

9. Section I tenants were already paying their utilities directly.

10. Notice of the utility pass-through was not given to Section II tenants until February 28, 1974.

argue (1) that their statutory rights under the National Housing Act were violated when these rent increases and other changes were approved by HUD without giving plaintiffs prior notice and an opportunity to be heard; (2) that their constitutional right to due process of law was infringed when these increases and changes were approved without prior notice and an opportunity for plaintiffs to be heard; (3) that their constitutional right to equal protection of the law was violated because they have been denied the rights sought here while tenants in similar housing projects in San Francisco, California have been granted these rights as a result of a court ruling in that jurisdiction; (4) that a regulation adopted by HUD which prospectively gives tenants in certain housing projects the rights sought here was intended to apply retroactively to plaintiffs; (5) that approval by HUD of a utility pass-through in each of the *Parks* and *Harris* cases constituted a breach of each plaintiff's lease and a violation of the applicable regulatory agreement between HUD and the landlord; (6) that the rent increase at the Bruce Manor project violated the Maryland Rent Control Act which was in effect on May 1, 1974; (7) that both rent increases at Meadowood Townhouses violated the Maryland Rent Control Act which became effective July 1, 1974; and (8) that certain provisions in their leases are unreasonable and unconscionable and should be declared by the Court to be unenforceable.

For the reasons stated hereinafter, this Court finds no merit in any of these contentions. Accordingly, judgment will be entered in favor of the defendants.

### The Statutory Claim

As their first point, plaintiffs claim that the relevant statutes grant them the right to be given prior notice and an opportunity to be heard before their rents may be increased by the landlords of the housing projects in question. Plaintiffs do not rely on the express language of any of the applicable statutes. Rather, plaintiffs argue that since it was the intention of Congress to confer upon them the benefits of low-cost housing, Congress by implication intended to give them the right to be heard before their benefits are diminished as a result of the approval by HUD of a landlord's application for a rent increase or other change in the terms of a lease. Plaintiffs assert that Congress must have intended that an aggrieved tenant have the right to notice and the right to present his cause to an appropriate body such as HUD before a rent increase were approved, because in the absence of a mechanism for enforcing a party's right to receive a benefit, the grant would be meaningless.

A review of the applicable statutory provisions discloses the existence of no such implied rights. On the contrary, the statutory provisions in question indicate that Congress did not intend that these procedural rights should be granted to individuals receiving benefits under the statutes. Rather, the language used discloses an intention to leave to the Secretary the widest possible discretion in implementing the general Congressional purpose. Thus, § 221(d)(3) provides that mortgagors are to be regulated or supervised by the Secretary "under a regulatory agreement or otherwise, *as to rents, charges, and methods of operation,* in such form and in such manner as in the opinion of the Secretary will effectuate the purposes of this section * * *." (Emphasis added). 12 U.S.C. § 1715*l* (d)(3). Similar language is used in § 236, Subsection (e) of which requires that "the project owner shall operate the project in accordance with such requirements with respect to tenant eligibility and rents as the Secretary may prescribe." 12 U.S.C. § 1715z–1(e). In addition, Subsection (h) authorizes the Secretary "to make such rules and regulations, to enter into such agreements, and to adopt such procedures as he may deem necessary or desirable to carry out the provisions of this section."

It is thus apparent that Congress intended to commit to the Secretary in the exercise of his discretion the protection of the interests of low-income families

residing in low-cost projects. These programs were implemented to meet a dire nationwide shortage of low-cost rental housing. To achieve maximum results with the funds available, Congress decided not to use public funds alone but to encourage private investors to build the necessary housing with federal assistance. H.R.Rep.No.1585, 90th Cong., 2d Sess. (1968), *1968 U.S.Code Cong. & Admin.News,* pp. 2873–74, 2894; S.Rep.No. 281, 87th Cong., 1st Sess. (1961), *1961 U.S.Code Cong. & Admin.News,* pp. 1923–25. The use of government funds would be limited to amounts which would reduce a private builder's expenses sufficiently to make building and operation of the projects feasible. Such an approach would result in the building of more units than if the federal government were to build and maintain the public housing, and in addition, the private housing industry would be given a much needed boost. Were the statute to include, either expressly or by implication, the detailed procedural rights claimed by plaintiffs, private investors might have been discouraged from participating in the program. Thus, Congress left it to HUD to protect the interests of the tenants and permitted the Secretary in his discretion to adopt regulations designed to afford such protection.

Various other courts have reached the same conclusion. In *Langevin v. Chenango Court, Inc.,* 447 F.2d 296 (2d Cir. 1971), the tenants in a § 221(d)(3) project contended that the denial of a trial type hearing on proposed rent increases violated their statutory rights. In an Opinion by Chief Judge Friendly, the Second Circuit held that the statute in question contained no such requirement, but left it open to the Secretary to deal with rents by a regulatory agreement or otherwise. The Court concluded that the statute thus accorded the Secretary "the

widest latitude of procedural choice." A similar result was reached in *Hahn v. Gottlieb,* 430 F.2d 1243, 1247 (1st Cir. 1970), in which the Court noted that it was important that those charged with implementing the subsidy program have "considerable procedural flexibility." *See also Harlib v. Lynn,* 511 F.2d 51 (7th Cir. 1975); *People's Rights Organization v. Bethlehem Associates,* 356 F.Supp. 407 (E.D.Pa.1973); *aff'd* 487 F.2d 1395 (3d Cir. 1973).[11]

### The Due Process Claim

Plaintiffs next contend that their rights under the due process clause of the Fifth Amendment were violated when HUD approved and the private defendants put into effect the rent increases and utility pass-throughs under challenge here. In asserting this ground for relief, plaintiffs rely on *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), which sets forth the due process requirements which plaintiffs claim are applicable in this case. In *Goldberg,* the Supreme Court held that procedural due process requires a state to grant recipients of public assistance payments adequate notice and an evidentiary hearing before the termination of their benefits. The plaintiffs in that case had been receiving financial aid under a federally-assisted program administered by New York State. The Court found that these benefits were not a privilege but a matter of statutory entitlement for qualified persons. Therefore, qualified recipients were found to have a property interest in continued benefits which could not be terminated by the State without resort to proper due process procedures.

First, it must be determined whether the facts of these cases show a sufficient governmental involvement for the Fifth Amendment to be applicable.

---

**11.** The plaintiff relies on several decisions of the United States Court of Appeals for the District of Columbia, namely *Marshall v. Lynn,* 162 U.S.App.D.C. 56, 497 F.2d 643 (1973) and *Thompson v. Washington,* 162 U.S.App.D.C. 39, 497 F.2d 626 (1973). The Sixth Circuit cited the *Marshall* case with approval in *Paulsen v. Coachlight Apartments Co.,* 507 F.2d 401, 403 (1974). This Court finds the reasoning of these cases to be unpersuasive.

The due process clause of the Fifth Amendment applies to and restricts only the federal government and not private persons. *Public Utilities Commission v. Pollak,* 343 U.S. 451, 461, 72 S.Ct. 813, 820, 96 L.Ed. 1068, 1076 (1952).

■ Little time need be spent in discussing this question. The statutory provisions relating to these § 221(d)(3) and § 236 projects and the undisputed facts as to the management of the projects show quite clearly that the federal government is significantly involved in the process whereby rents are increased or lease terms are changed by these landlords. It is thus not necessary to determine whether the due process clause of the Fifth Amendment would likewise apply to the acts of the private defendants.[12] A finding by this Court that acts taken by the federal defendants in approving the rent increases violated the due process clause of the Fifth Amendment would necessarily invalidate acts taken by the private defendants in implementing the approvals.

■ The more difficult question presented in this case is whether plaintiffs, under the facts here, have a property right or entitlement under *Goldberg v. Kelly* and its progeny subject to constitutional protection. Only if each plaintiff has a "legitimate claim of entitlement" to the governmentally-conferred benefit would he have a right to prior notice and a hearing before the federal defendants acted. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). In the *Roth* case, the Supreme Court said the following (408 U.S. at page 577, 92 S.Ct. at page 2709, 33 L.Ed.2d at page 561):

Certain attributes of "property" interests protected by procedural due

process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in *Goldberg v. Kelly, supra,* had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.

■ Thus, what must be determined here is whether these plaintiffs have a legitimate claim of entitlement to the benefits conferred on them by the National Housing Act or whether the legislation in question gave them no more than a unilateral expectation of such benefits. It has been recognized that the dimensions of a property interest are defined by the law which creates it. *Goss v. Lopez, supra,* 419 U.S. at 572–73, 95 S.Ct. at 735, 42 L.Ed.2d at 733; *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). For there to

---

12. By analogy, *Joy v. Daniels,* 479 F.2d 1236 (4th Cir. 1973), a case in which the Court found the acts of a private landlord to constitute state action in a suit brought under 28 U.S.C. § 1343 suggests that the strictures of the Fifth Amendment would indeed be applicable to the acts of the private defendants in these cases.

be an entitlement, the law must require that a benefit be conferred once a condition stated in the law is found to exist. *Arnett v. Kennedy, supra* at 181–182, 94 S.Ct. at 1657–1658, 40 L.Ed.2d at 48–49. The condition in question must be a legal requirement which the beneficiary may insist upon at a hearing. See *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570, 579 (1972).

The source of the entitlement claimed by the plaintiffs in these cases is the National Housing Act. The Housing Act of 1949, 42 U.S.C. § 1441 et seq., which is the foundation for subsequent housing legislation, mandated "the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family" and provided that HUD "shall exercise [its] powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established."

Congress could have approached the problem of providing decent low-cost housing by committing funds solely for public housing. It chose instead to stimulate the building of low-cost housing by private industry, and over the years has enacted legislation of various kinds providing incentives and inducements to encourage participation by private industry in building and managing the housing required. Various forms of federal assistance were provided in § 221 and § 236 of the Act, including federal insurance of mortgages, federal contributions to the payment of interest and the like. Had the legislation expressly provided that a low-income tenant under specified conditions would be entitled to continue in his tenancy at a certain rate, the benefit conferred on the tenant would no doubt constitute a property right or entitlement under the *Roth* formulation. However, such a provision probably would have discouraged private industry from expending private funds to build the necessary housing. Participation in such programs would hardly be attrac-

tive to a landlord if, faced with increasing costs over which he could exercise no control, he could implement rent increases only after proving their necessity in administrative proceedings at which tenants would have the right to appear.

Insofar as these § 221(d)(3) and § 236 programs are concerned, Congress decided on a middle road. Landlords would not be permitted to increase rents on their own, as private landlords might otherwise have the right to do. Rather, a landlord would have to apply to HUD and receive HUD approval for any increase in rent. HUD was given broad power to promulgate regulations which would protect the rights of both landlords and tenants insofar as consideration of and action on these requested rent increases were concerned. It was thus left to the discretion of HUD to accommodate the conflicting interests here. On the one hand, landlords would have to be permitted a fair rate of return, and on the other hand, rents charged low-income tenants would have to be reasonable, depending upon economic conditions existing at a particular time.

■ Circumstances such as these disclose no entitlement granted by this legislation to tenants permitting them to continue their occupancy at a particular rent. The law here states no condition which a tenant could prove and which would require continuation of his tenancy. Thus, even though tenants are beneficiaries under this legislation, they would not be able to show at an administrative hearing before HUD that the law requires that they continue to receive the benefit of these programs at a particular low rent. Whether or not benefits accruing to a tenant at a fixed rent should continue has been committed to the sole discretion of HUD.

Furthermore, Congress has recognized by recent amendments to the National Housing Act that tenants of projects such as these have no continuing right to hold their tenancies at a fixed rent. § 212 of the Housing and Community

Development Act of 1974, 12 U.S.C. § 1715z–1, amended § 236 of the Act by authorizing the Secretary to make direct assistance payments to § 236 project owners to cover increased utility costs and property taxes. The history and purpose of this legislation was discussed in some detail in this Court's recent Opinion in *Ross v. Community Services, Inc.,* 396 F.Supp. 278 (D.Md.1975).[13] As indicated in that Opinion, Congress was concerned that increased costs and resulting increased rents in § 236 projects would lead to the eviction of low-income tenants unable to pay all or part of such increased rents. Thus, § 212 of the 1974 Housing Act authorized the Secretary to provide additional assistance payments to landlords where needed to offset increases in the costs covered. Such subsidies were intended to inure to the benefit of the low-income tenants and to prevent their eviction because of their inability to pay the increases.[14]

The First, Second, Third, Sixth and Seventh Circuits have all held that tenants in federally-assisted projects such as those involved in these cases do not have a constitutional right to prior notice and a hearing before their rents can be increased. *Hahn v. Gottlieb, supra* (1st Cir.); *Langevin v. Chenango Court, Inc., supra* (2d Cir.); *People's Rights Organization v. Bethlehem Associates, supra* (3d Cir.); *Paulsen v. Coachlight Apartments Co., supra* (6th Cir.); *Harlib v. Lynn, supra* (7th Cir.). The Ninth Circuit, in a 2 to 1 decision, held to the contrary in *Geneva Towers Tenants' Organization v. Federated Mortgage Investors,* 504 F.2d 483 (9th Cir. 1974).[15] Even though the *Hahn* and *Langevin* cases were decided before *Board of Regents v. Roth, supra,* and its companion, *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the reasoning of those cases

remains sound when examined in the light of recent Supreme Court decisions. As Chief Judge Friendly so aptly put it in the *Langevin* case (at page 301):

> Congress might reasonably think that, in an inflationary era, construction on the basis of distributions limited to 6% of equity investment, with all the other restrictions imposed on landlords of such projects, would be decidedly unattractive, even with a 3% interest rate on the mortgage, if rent increases "necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes * * and operating and maintenance expenses over which Owners have no effective control," the only basis recognized in the standard regulatory agreement, can be held up for months during a trial-type hearing, with discovery of the owner's records, the taking of testimony, and written findings by an examiner. The due process clause does not forbid Congress from deciding, if it wishes, that federal assistance to "private industry in providing housing for low and moderate income families and displaced families" in the form of insurance and purchase of low interest mortgages need not be conditioned on the granting of an evidentiary hearing with respect to rent increases, but, in the absence of some governmental scheme of rent control, whether general or particularized, may instead be confided to the decision of the experienced staff of the FHA, which has been instructed to subject rent increase applications to thorough investigation to the end that tenants should not be imposed upon. The complementary objectives of Congress, admittedly constitutional and laudable, were to encourage private enterprise to undertake the construction of hous-

---

13. See also this Court's later Opinion in that same case, *Ross v. Community Services, Inc.,* 405 F.Supp. 831 (1975).

14. The legislative history of § 212 further shows a recognition by Congress that in an inflationary era continuing increases in the cost of utilities and property taxes would com-

pel landlords to raise rents. *Ross v. Community Services, Inc., supra* at 285.

15. Judge Hufstedler dissented in *Geneva Towers,* for reasons which this Court finds quite persuasive and with which this Court would agree.

ing for low and moderate income and displaced families, thereby dispensing with the use of governmental funds for equity investment, and to see that an appropriate share of the benefits of the federal assistance went to the tenants. Within this framework Congress has power to decide—or to authorize the FHA to decide—what procedural mix will best accomplish its aims.

Plaintiffs' reliance on *Joy v. Daniels,* 479 F.2d 1236 (4th Cir. 1973), is misplaced. There suit had been brought under 42 U.S.C. § 1983, and the question was whether a tenant could be evicted from a § 221(d)(3) project without being afforded a due process type hearing. The Fourth Circuit found that the action of the landlord in evicting the plaintiff constituted state action under § 1983, that plaintiff had a property right or entitlement to remain in his tenancy beyond the term of the lease except for good cause, and that such right was entitled to due process protection.

But there is a vast difference in the right to occupy premises beyond the term of a lease and the right to occupy premises at a certain fixed rental. The Court in *Joy* found that Congress, in enacting the legislation, was contemplating more occupancy entitlement than limited leasehold terms and that this expectation of some degree of permanency was bolstered by custom. 479 F.2d at 1241. But there is no such expectation or custom insofar as the fixing of rents is concerned. The applicable statutes authorize the Secretary to regulate "as to rents", and there is no custom in the rental housing market that rents will not be periodically raised from time to time. Indeed, in an inflationary era the custom or expectation is quite to the contrary, as the landlord is faced with increasing taxes, utility costs and other expenses.

For these reasons, this Court concludes that tenants in projects such as these can claim no property right in or entitlement to occupancy of their premises at a fixed rent.[16] What they have is an abstract need or desire to continue to pay low rents, but this unilateral expectation is not enough to constitute a legitimate claim of entitlement. Thus, the principles of *Goldberg v. Kelly, supra,* do not afford plaintiffs the right to notice and a hearing before their rents are increased or the terms of their leases are changed.[17]

### The Equal Protection Claim

By letter dated March 28, 1973, the Director of the Housing Management Division for HUD in San Francisco, California instructed the owners and managing agents of projects constructed under §§ 202, 221(d)(3) and 236 of the Act within the area to follow procedures which would afford tenants notice and an opportunity to make written comments before the approval of rent increases requested by landlords. Such directive was issued pursuant to the order of the United States District Court for the Northern District of California in *Geneva Towers Tenants' Organization v. Federated Mortgage Investors,* Civil No. C–70 104 S.A.W., *aff'd* 504 F.2d 483 (9th Cir. 1974). The District Court had ruled in that case that the due process clause required (1) that tenants be given notice of their lessors' application for approval of a rent increase; (2) that tenants have a reasonable opportunity to make written objections; and (3) that tenants be furnished with a concise statement of HUD's reasons for approving the increase. *Geneva Towers Tenants' Organization, supra* at 485. The declaratory judgment issued by the District Court required implementation of this ruling in

---

16. The same reasoning is applicable to plaintiffs' contention that they have a right to continue to require that their landlords pay their utility charges. *Fleming v. R. I. G. H. T. Corp.,* Civil No. 73–2559 (E.D.Pa. June 19, 1974), *aff'd* 511 F.2d 1393 (3d Cir. 1975), *cert. denied* 423 U.S. 848, 96 S.Ct. 88, 46 L.Ed.2d 70 (1975).

17. As this conclusion is applicable in all three cases, it is not necessary to consider the additional argument advanced by defendants in the *Harris* case that tenants in a cooperative housing project participate in the management of the landlord's business affairs and thereby are afforded notice and an opportunity to be heard before rent increases become effective.

the area under the jurisdiction of HUD's San Francisco regional office.[18]

Plaintiffs contend that the federal defendants in granting these rights to tenants in San Francisco while denying them to tenants here violate their rights to equal protection of the law within the meaning of the Fifth Amendment to the Constitution. Invoking the traditional equal protection test, plaintiffs argue that the classification by HUD of tenants into two groups, the first representing San Francisco area residents and the second residents of all other areas is not a rational means of accomplishing any permissible goal.

Plaintiffs have cited no authorities, nor is this Court aware of any, supporting this unusual contention. On the contrary, it has been observed that the equal protection clause "does not * * assure uniformity of judicial decisions." *Milwaukee Elec. Ry. Co. v. Wisconsin ex rel. City of Milwaukee,* 252 U.S. 100, 105–06, 40 S.Ct. 306, 309, 64 L.Ed. 476, 480 (1920); *Beck v. Washington,* 369 U.S. 541, 554–55, 82 S.Ct. 955, 962, 8 L.Ed.2d 98, 109–110 (1962). The manner in which the federal judicial system itself functions indicates the lack of merit in plaintiffs' contention. Conflicts between the Circuits exist as to many areas of the law, and the existence of such conflicts is well-recognized and is a consideration governing the review of a case by the Supreme Court on writ of *certiorari.* U.S.Sup.Ct. Rule 19. Were plaintiffs correct in the argument advanced in this case, a litigant in one Circuit would automatically be entitled to the benefits of a ruling in another Circuit merely by relying upon the equal protection clause. Quite clearly, this is not and cannot be a viable proposition of constitutional law.

## The Applicability of HUD's Interim Regulation

On September 11, 1974, HUD published in the Federal Register a proposed "Interim Rule" to become effective October 14, 1974. 39 F.R. 32736 (1974). This regulation established certain new procedures for § 221(d)(3) and § 236 projects, including (1) notification to tenants of a landlord's intention to apply for an increase in the maximum permissible rents; (2) an opportunity for tenants to make written comments to the landlord and to the local HUD office; and (3) notification to tenants of HUD's decision and the reasons for that decision. As stated when the Rule was adopted in final form,[19] it was HUD's intention that the Interim Rule should not have any retroactive effect, and it was explicitly made applicable only to applications for rent increase received on or after October 14, 1974. 40 F.R. 29074 (1974).

The application for the first rent increase at Meadowood Townhouses was submitted by the landlord on April 16, 1974, and became effective July 1, 1974, although not finally approved by HUD until September 9, 1974. The application for the second increase and for a change in the lease form to provide for the payment by tenants of utility expenses was submitted on September 20, 1974, was approved on October 18, 1974 and became effective November 1, 1974. In the *Parks* case, plaintiffs contend that the interim rule's procedures should have been followed for both applications, relying on several Supreme Court and Fourth Circuit decisions.[20]

The cases cited by plaintiffs have no bearing on the question at hand, since they deal with the proper construction of

---

**18.** The San Francisco Regional Office of HUD clearly adopted the new procedures in response to the Court order. The action taken was not intended to be a matter of general HUD policy and was not instituted as such.

**19.** The regulation was not adopted in final form until July 10, 1975. 40 F.R. 29073 (1975).

**20.** Plaintiffs rely on *Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); *Bradley v. School Board of the City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *United States v. Schooner PEGGY,* 1 Cranch 103, 2 L.Ed. 49 (1801); and *Thompson v. School Board of the City of Newport News,* 472 F.2d 177 (4th Cir. 1972).

a statute where the intent of the Legislature is unclear. The Supreme Court in *Bradley v. Richmond School Board* specifically stated: "Where Congress has expressly provided, or the legislative history had indicated, that legislation was to be given only prospective effect, the courts, in the absence of any attendant constitutional problem, generally have followed that lead." 416 U.S. 696, at 715, n. 21, 94 S.Ct. 2006, at 2018, 40 L.Ed.2d 470, at 490. Thus, a law is not to be given retroactive effect where there is a clear expression of intent that the law apply only prospectively. In promulgating the interim rule relied upon by plaintiffs, HUD clearly indicated by express language in the rule itself that it was to have prospective effect only.

In essence, plaintiffs are complaining that HUD should have decided to apply the interim rule retroactively. The simple answer is that, in the exercise of the power delegated to it by Congress to promulgate regulations governing projects under the Act, HUD did not so decide. Following extensive litigation of the questions involved in various federal courts resulting in conflicting decisions, HUD finally decided that it would be desirable to adopt a uniform national policy affording tenants the right to participate to a limited degree in the process whereby rent increases were approved. There has been no showing by plaintiffs that HUD abused its discretion in exercising its rule-making power as it did nor that plaintiffs were deprived of any constitutional right when the procedures became effective on the date specified.

*The Claimed Breach of the Lease and of the Regulatory Agreement*

In the *Parks* case, the plaintiffs contend that their leases were breached when their landlord required them to pay their utility expenses directly. It is further claimed that this requirement that they pay directly for their utilities was a violation of the Regulatory Agreement between HUD and their landlord.

Plaintiffs in the *Parks* case and their landlord, Meadowood Associates, Ltd., had executed leases covering the rented units at the Meadowood Townhouses project on model forms approved by HUD.[21] The lease of plaintiff Parks was for a term of one year commencing April 1, 1971 and ending March 31, 1972. The lease of plaintiff Tolliver commenced on September 1, 1971 and ended on August 31, 1972. Paragraph 2 of these leases provided that the monthly rental should include the cost of all utilities and specified that the landlord should not collect any charges for such utilities in addition to the monthly rental. Paragraph 4 provided that at the end of the term the lease would be automatically renewed for successive terms of one month each, subject to adjustment in the monthly rental on thirty days' written notice by the landlord to the tenant. It was further provided that either party might terminate the lease at the end of the initial term or any successive term by giving thirty days' written notice in advance to the other party. Thus, when the Meadowood Townhouses leases were changed by the landlord in 1974 to reflect the utility pass-throughs, these plaintiffs were renting on a month-to-month basis, and each plaintiff was given thirty days' notice of the proposed change. Upon receipt of this notice, plaintiffs did not elect to terminate their leases. Rather, they paid their utilities directly as required by the modified leases and later challenged the legality of the modification in the suit they filed in this Court.

Under the circumstances here, plaintiffs' contention that this change in terms was a breach of their leases cannot be sustained. At the time notice of the change was received, plaintiffs were occupying their premises on a month-to-month basis. The thirty days' notice

21. The model form of lease used for § 236 projects was promulgated by HUD pursuant to 24 C.F.R. § 236.75.

they received from their landlord was in effect notice of a termination of their existing leases, and an offer of a new lease upon new terms. By continuing to occupy the premises and pay the utility expenses directly, plaintiffs accepted these new terms and are bound by them.

Plaintiffs also claim that the Regulatory Agreement between their landlord and HUD has been breached and that they are entitled to relief because of this breach. Such Regulatory Agreement was executed by Meadowood Associates, Ltd. and HUD pursuant to 24 C.F.R. § 236.1. Paragraph 4(b) provides that the rental charged for each unit shall include all utilities except telephone charges. Plaintiffs assert that when they were required to pay their utility expenses, their landlord violated the terms of this agreement.

 Basic contract principles establish that the parties to an agreement have the right to modify it as it may appear that their own best interests require. *Corbin on Contracts,* § 1294. However, where the parties manifest an intention to benefit a third party, their freedom to modify the agreement may be limited or even forfeited in circumstances where the third-party beneficiary has given the promisee consideration or has acted to his detriment in reliance upon a promise contained in the agreement. *Spates v. Spates,* 267 Md. 72, 77, 296 A.2d 581 (1972). Thus, plaintiffs here assert that as tenants they are third-party beneficiaries and have the right to enforce the provisions of the Regulatory Agreement between HUD and their landlord.

 The undisputed facts here do not support plaintiffs' contention that they are third-party beneficiaries with the right to enforce the provisions of this Regulatory Agreement. *See Harlib v. Lynn, supra* at 56. Neither consideration given by the plaintiffs nor detriment suffered by them in reliance upon

a promise contained in the Regulatory Agreement has been shown. As discussed more fully hereinabove, the applicable statutes and the facts here do not indicate any intention by HUD, in its dealings with the landlord, to confer upon tenants a property right or other enforceable interest. The provisions of the statute conferring broad discretion on the Secretary to administer § 236 projects were designed to allow the Secretary a degree of flexibility which would enable him to respond to changes in the economic situation and in the housing market from one community to another and from time to time. In view of this recognized need to retain as much flexibility as possible, HUD could hardly have intended to confer a beneficial interest on tenants when it executed this Regulatory Agreement. If required to secure the consent of each tenant every time it wished to modify the Regulatory Agreement, HUD would be severely limited in the exercise of its broad supervisory powers over these projects.

Furthermore, it does not appear that the parties to the Regulatory Agreement contemplated that tenants should benefit even incidentally from the provision requiring that the rent charged should include utilities. § 236 projects were expected to be self-sustaining. The rents, together with the limited federal assistance provided, would have to be sufficient to allow the project to be run efficiently and still afford the landlord a reasonable return on his investment.[22] Whether the landlord paid for the utilities and adjusted rentals accordingly or tenants paid their utility bills directly, the money for the payment of utility expenses would have to come from the tenants ultimately. Here, HUD and Meadowood Associates, Ltd. initially agreed that the landlord would pay for utilities and include this sum in the rent. However, when it was found that such a procedure would during periods of inflation result in continuing applications for

---

**22.** The financial status of the three projects involved in this case has remained poor in spite of the rent increases.

increases in rent, the parties agreed to modify the provision in question to require that tenants would pay for their utilities directly. Moreover, the new system was a much fairer one for the tenants as a whole. Those tenants who used less utilities than the average would stand to gain from the change while those tenants who used more utilities than the average would themselves pay for the exact amount of utilities they used. More importantly, the landlord would be saved the administrative expense of applying for rent increases every time utility costs rose, a saving which would inure to the benefit of the tenants in the long run.

### The Claimed Violation of the Maryland Rent Control Act—the Fenner Case

In the *Fenner* case, plaintiffs contend that the rent increases at Bruce Manor Apartments were instituted in violation of the Maryland Rent Control statute which was in effect on May 1, 1974, the date of the increase. The statute in question was enacted as Chapter 794 of the Acts of 1973 and was codified as § 45 of Article 53 of the Annotated Code of Maryland (1972 Repl. Vol.). Pertinent portions of this enactment are as follows:

(a) No landlord renting four or more units may increase any rental fee for any residential premises or for the part of any premises which is used as a residence beyond an amount which is five percent (5%) of the rental fee which was in effect on January 11, 1973 except as provided in subsection (b). All rent increases subsequent to January 11, 1973, which exceed five percent (5%) of the rental fee which was in effect on that date shall be null and void.

(b) However, the landlord may also add to the rental fee permitted in subsection (a) the proportionate share of the amount of any increases in costs to the landlord for the premises since January 11, 1973, resulting from increases in real estate taxes, water and sewer charges, utility rates, and any actual cost of capital improvements constructed since that date. * * * Written documentation of the basis upon which the proportionate increase in the rental fee is calculated shall be made available to the tenant at the time the tenant is notified of the rent increase.

\* \* \* \* \* \*

(f) This section shall not apply to federally financed projects where the rent is determined as a percentage of the tenant's income.

Defendants assert that they have complied with Subsection (b) of this statute, and that therefore the rent increases in question are valid. Defendants further contend that Subsection (f) exempts § 221(d)(3) projects from the operation of this statute, that because of later amendments to the Maryland statute only the Attorney General of the State can now enforce the statutory provisions, and that if the Maryland law is construed to apply to the increases approved by the Secretary, it would frustrate the purposes and objectives of Congress and would therefore be invalid to the extent that it conflicted or interfered with Congressional aims. In view of this Court's conclusion that the private defendant in the *Fenner* case has complied with Subsection (b) of the Maryland statute, it is not necessary to consider any of these other contentions.[23]

Subsection (b) of the Maryland Rent Control Act permitted a landlord in Maryland to add to the rent charged any increases in costs since January 11, 1973 resulting from increases in real estate taxes and utilities, provided that written documentation of the basis for the increase "shall be made available" to the tenant at the time the tenant is notified of the rent increase. The undisputed

---

**23.** In particular, it is not clear that a § 221(d)(3) project is one "where the rent is determined as a percentage of the tenant's in-

come," as required by Subsection (f). As discussed *infra,* a § 236 project is exempt under that provision.

facts here show that the higher rents at Bruce Manor Apartments were necessitated by increases in real estate taxes and utilities. Plaintiffs argue, however, that their landlord did not provide them with written documentation as required by the statute.

Although the facts here disclose that the private defendants in the *Fenner* case did not send each tenant written documentation for the rent increases, it appears that the documents in question were "available" for a tenant's inspection at the landlord's offices. Indeed, the landlord was required by the National Housing Act to furnish such documentation to HUD and necessarily had copies available at its office. Plaintiffs have neither alleged nor established that the private defendants at any time refused to permit them to review the written documents in question at the landlord's office.

The words used by the Maryland Legislature in the 1973 enactment were "made available". Plaintiffs misconstrue the statutory meaning when they argue that their landlord is thereby required to send them the written documentation in question when they were notified of the rent increases. Being "available" under this statute means being "accessible". *Webster's Third New International Dictionary.* Rather than mandating that the landlord send each tenant copies of the extensive documentation in question, the Legislature in enacting the 1973 statute adopted the more reasonable approach of merely requiring the landlord to have this written material available at its office on request. That this was the legislative intent is clear when the 1974 statute is compared with that enacted in 1973. As discussed more fully hereinafter, Subsection (c) of the 1974 statute required that written documentation "shall be provided" to the tenant at the time the tenant is notified of the rental increase. This change would have been unnecessary if the 1973 statute had the meaning attributed to it by plaintiffs.

Thus, in the *Fenner* case the landlord was in full compliance with the exception contained in Subsection (b) of the 1973 Act. Therefore, the Maryland statute does not invalidate the increases at Bruce Manor Apartments.

*The Claimed Violation of the Maryland Rent Control Act—the Parks Case*

■ By Chapter 741 of the Acts of 1974, effective July 1, 1974, the Maryland Legislature amended the Maryland Rent Control Act. That enactment has been codified as Section 8–209, Real Property Article, Maryland Annotated Code (1974 Supp.). In the *Parks* case, plaintiffs contend that the rent increases at Meadowood Townhouses violate that Section. Provisions of the statute pertinent to the questions raised in this case are the following:

(b) *Maximum increase in rental fee.*—No landlord renting four or more units may increase any rental fee for any residential premises or for the part of any premises which is used as a residence beyond an amount which is five percent (5%) of the rental fee which was in effect on July 1, 1974, except as provided in subsection (c). That part of any rental fee increase which exceeds five percent (5%) of the rental fee which was in effect on July 1, 1974, shall be null and void.

(c) *Increase based on increases in certain costs.*—The landlord may add to the rental fee increase permitted in subsection (b) the proportionate share of the amount of any increases in costs to the landlord for the premises since July 1, 1974, resulting from increases in real estate taxes as of January 11, 1973, water and sewer charges, utility rates, heating fuel charges as of January 11, 1973, and any actual cost of capital improvements constructed since that date. * * *

\* \* \* \* \* \*

(g) *Exempt projects or units.*—This section shall not apply to federally financed projects where the rent is determined as a percentage of the tenant's income; and this section shall

not apply to rental fees for units of educational institutional housing not operated for a profit.

(h) *Injunction.*—If a landlord increases a rental fee beyond the limitation imposed by this section, the Attorney General may seek and obtain in an action in the appropriate court an injunction prohibiting the landlord from increasing the rental fee beyond the permissible limit. Prior to seeking the injunction, the Attorney General shall notify the landlord and generally indicate the relief sought. Notification shall be served at least seven days prior to the institution of the action. The court may make the orders or judgments necessary to prevent the unlawful increase of a rental fee or to restore to a tenant any money acquired in violation of this section.

Several significant changes in the law were made by the 1974 enactment. As previously noted, Subsection (c) requires that written documentation of the basis for the increase in rental "shall be provided" to the tenant at the time the tenant is notified of the rent increase. Thus, whereas before July 1, 1974, the landlord was merely required to make documentation available, the new law made him furnish the documentation to the tenant at the time of notice.

Like Subsection (f) of the 1973 Act, Subsection (g) of the 1974 Act exempts "federally financed projects where the rent is determined as a percentage of the tenant's income; * * *." In a § 236 project, the rent charged each tenant is either the basic rental as determined pursuant to 24 C.F.R. § 236.55 or 25% of the tenant's income, whichever is greater. Thus, Meadowood Townhouses is a federally-financed project where the rent of some tenants is determined as a percentage of the tenant's income, and the provisions of § 8–209 are not applicable.

Plaintiffs assert that they pay the basic rental and that therefore the Subsection (g) exemption does not apply to them. However, the law applies the exemption to "projects" and not to individual tenants. Under federal law, the rent charged every tenant of a § 236 project is measured against a percentage of his income, as the rent to be charged is either the basic rental or 25% of his income whichever is greater. This Court concludes that the Maryland Legislature did not intend Section 8–209 to apply to a § 236 project like Meadowood Townhouses.[24]

### The Claim that Certain Lease Provisions are Unfair

As their final point, plaintiffs in the *Fenner* and *Parks* cases claim that certain provisions in their leases are unfair, unreasonable, unconscionable and unlawful. They point out that the provisions in question are required by HUD to be included in leases at these projects, and they ask the Court to declare these provisions to be illegal and to order HUD to require the use of lease agreements which fairly protect the interests of both the tenants and the landlords.

Included among the provisions attacked are clauses exculpating the landlords from liability under certain conditions, giving landlords the right of reentry without notice on a tenant's breach, providing for waiver of notice and confession of judgment in a proceeding brought by a landlord against a tenant to recover possession, permitting eviction without cause upon thirty days' notice, requiring payment by the tenant of the landlord's legal fees in an eviction proceeding, providing penalties for delinquent payment of rent and requiring the forfeiture of a security deposit for failure of a tenant to fulfill a lease term. Some of these provisions are claimed to

---

**24.** Moreover, it is doubtful under Subsection (h) that an individual tenant has a right to pay the increased rent and seek a declaratory judgment that the increase was invalid. The right of action is conferred upon the Attorney General of Maryland by Subsection (h), and in such an action, the Court may enter whatever judgment may be necessary or restore to the tenant money acquired by the landlord in violation of the statute.

be unconscionable under general provisions of law, others assertedly violate Maryland law, and plaintiffs further contend that certain clauses which HUD has determined to be unreasonable in leases of tenants residing in public housing are included in the leases which plaintiffs executed.

Whatever the merits of these contentions, they have been raised in the wrong forum at the wrong time. Whether or not the National Housing Act requires the Secretary to promulgate leases in § 221(d)(3) and § 236 projects which are fair to both landlords and tenants, plaintiffs have not shown in these cases that they have suffered any injury as a result of these allegedly unfair lease provisions. In the absence of a case or controversy between the parties, this Court will not undertake to decide the questions presented. *Public Service Comm'n v. Wycoff Co.,* 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952); *Willing v. Chicago Auditorium Ass'n,* 277 U.S. 274, 48 S.Ct. 507, 72 L.Ed. 880 (1928).

Plaintiffs have not alleged or shown that the private defendants have at any time sought to enforce against tenants the provisions challenged in these cases. When eviction or other proceedings are instituted by one of the landlords, and when in any such proceeding the landlord relies upon terms contained in the particular lease, the injured plaintiff would then be involved in a justiciable controversy and would be entitled to present for decision the questions raised here. In these cases, the plaintiffs have not alleged or shown that their landlords are preparing to enforce any of the challenged provisions against them or that the presence of these clauses in their leases impairs the enjoyment of their tenancies in any other way. This Court will not, under these circumstances, undertake to render an advisory opinion concerning issues which are not ripe for decision, may never arise, and if they do, may be presented in another forum.

*Conclusion*

For the reasons stated, plaintiffs' motions for summary judgment in all three cases will be denied and the defendants' motions for summary judgment in all three cases will be granted. An appropriate Order will be entered by the Court.