Thelma **JOY**, Individually and on Behalf
of all others similarly situated,
Appellant,

v.

Holland **DANIELS**, Chairman, et al.,
Appellees.

No. 72-2479.

United States Court of Appeals,
Fourth Circuit.

Submitted March 27, 1973.

Decided June 11, 1973.

Frank Epstein, Charleston, S. C., on brief for appellant.

No counsel for the appellees.

Before CRAVEN, BUTZNER and RUSSELL, Circuit Judges.

CRAVEN, Circuit Judge:

By this action for declaratory and injunctive relief under 42 U.S.C. § 1983, plaintiff challenges, as violative of the fifth and fourteenth amendments, her threatened eviction from the Joseph Paul Apartments. The apartments are quasi-public, having been constructed and now being operated by defendant, Joseph Paul Apartments, Inc., under Section 221(d)(3) of the National Housing Act. The district court held that the plaintiff could properly be evicted since her tenancy had expired under the terms of the lease, and that no other cause need be assigned for the eviction. We reverse.

I.

The plaintiff, Thelma Joy, is the head of her household and with her four minor children constitutes a "family" within the statutory scheme. Her effective monthly income [1] of $222.20 is a "low income" for purposes of the federal housing programs, and she thus qualifies for occupancy in the Joseph Paul Apart-

---

1. It consists of a welfare benefit in the amount of $122.20, plus $126.00 worth of food stamps at a cost to her of $26.00.

ments. On September 2, 1970, plaintiff leased one of defendant's apartments. The standard form lease provided in relevant part:

> At the end of one year, lease is automatically renewed from month to month, rent to be payable in advance without demand on first day of each month. Either party may terminate lease at end of term or any successive term by giving 30 days' notice in advance to other party.

On September 11, 1971, the defendant gave plaintiff 30 days' notice to vacate, no cause being assigned.[2] It appears that the plaintiff has continued to occupy her apartment on a month-to-month basis, with her tenancy dependent on the outcome of this litigation.

Section 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715*l*(d)(3) (1971), is a statutory scheme for encouraging housing for low income families. To participate in this program, defendant was required to conform to a regulatory agreement with the Federal Housing Administration governing, inter alia, the construction, occupancy, and daily operations of the project. The FHA also grants defendant rent supplements for the plaintiff and other tenants under Section 101 of the Housing and Urban Development Act of 1965, 12 U.S.C. § 1701s(b) (1971). Plaintiff, for example, enjoys occupancy of an apartment worth $157.00 per month at a cost to her of $48.00. FHA pays the difference, i.e., $109.00 per month, directly to defendant. As a prerequisite to participation in the rent supplement program, there must be local government approval. 24 C.F.R. § 5.15(c) (1971). The

County Council specifically approved rent supplements for Joseph Paul Apartments on August 6, 1968.

## II.

■ ■ Initially we must determine if the fourteenth amendment is applicable, i.e., whether the action of defendant in seeking to evict plaintiff can be said to be "state action" since it is well settled the fourteenth amendment does not inhibit the conduct of purely private persons in their ordinary activities. Adickes v. S. H. Kress & Co., 398 U.S. 144, 169, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The Supreme Court has never attempted to fashion a precise formula of what constitutes "state action" and the question frequently is difficult to determine. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 172, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Burton v. Wilmington Parking Auth., 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). "State action" may result from administrative, regulatory, legislative, and judicial action. Moose Lodge No. 107, 407 U.S. at 179, 92 S.Ct. 1965. The determination must be made on a case-by-case basis. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton, 365 U.S. at 722, 81 S.Ct. at 860.

■ In the present case the defendant receives mortgage benefits from the FHA and is thus subject to the attendant FHA regulations.[3] Additionally, the defendant has undertaken to utilize the eviction procedures authorized by South Carolina.[4] While these fac-

---

2. In its answer to the complaint the defendant alleged that the plaintiff "maintained a slovenly and ill-kept apartment;" had destroyed window screens; failed to pay rent on time; and, used excessive electricity. The district court found that it could be inferred that these were the reasons defendant sought eviction, but that such a finding was unnecessary to decision and thus no such inference was drawn.

3. The principal benefit is a lower rate of interest than available commercially. The court in McGuane v. Chenango Court, Inc., 431 F.2d 1189 (2d Cir. 1970) cert. denied, 401 U.S. 994, 91 S.Ct. 1238, 28 L.Ed.2d 532 (1971), held that the mere receipt of benefits under Section 221(d)(3) was insufficient to make the recipient an agency of the state and to thus establish "state action."

4. Since such laws are applied neutrally, they will not generally arise to a level

tors, either separately or combined, have been held insufficient to constitute "state action" they are relevant and material in the assessment of other evidence of state involvement.[5]

The defendant receives rent supplements from the FHA. Prerequisite to obtaining these supplements, the defendant received specific authorization from the County Council. We view this involvement of the state (power delegated to local government) in this case as similar to the zoning power which, with state eviction proceedings, resulted in a holding of "state action" in Lavoie v. Bigwood, 457 F.2d 7 (1st Cir. 1972).[5a]

■ The participation of the federal government in such housing projects is conditioned upon state approval. The state is thus involved for there would otherwise be no federal direct funding through rent subsidies and indirect funding through mortgage benefits. We think that these factors coupled with utilization of state eviction procedure have "so far insinuated [the state] into a position of interdependence" with the defendant that the challenged activity "cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Burton*, 365 U.S. at 725, 81 S.Ct. at 862. *See* McQueen v. Druker, 438 F.2d 781, 784 (1st Cir. 1971). Accordingly, we hold there is sufficient state involvement to constitute "state action" for purposes of the fourteenth amendment. We also hold that the facts are sufficient to satisfy the "under color of" law clause of 42 U.S.C. § 1983. *See Adickes*, 398 U.S. at 161–172, 90 S.Ct. 1598; *Lavoie*, 457 F.2d at 15; McQueen v. Druker, 317 F.Supp. 1122, 1133 (D.Mass.)

(Wyzanski, C. J.), aff'd in part, 438 F.2d 781 (1st Cir. 1971). Accordingly, the district court had jurisdiction under 28 U.S.C. § 1343(3).[6]

### III.

■ The district court concluded that plaintiff had no right of occupancy upon expiration of the term of the lease. Plaintiff contends that despite expiration of the term she may be evicted only for "good cause" and is entitled to the protection of procedural due process in the determination of whether cause exists. Since procedural due process applies only to the deprivation of interest protected by the fourteenth amendment, *i.e.*, liberty and property, we must first determine plaintiff's substantive rights. *See* Board of Regents v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *McQueen*, 317 F.Supp. at 1128.

As stated in Board of Regents v. Roth:

> Certain attributes of 'property' interests protected by procedural due process emerge from [the Court's] decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

of state action. Wiegand v. Afton View Apartments, 473 F.2d 545 (8th Cir. 1973); *McGuane*, 431 F.2d at 1190.

5. *See* Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

5a. *See also* Note, Procedural Due Process in Government-Subsidized Housing, 86 Harv.L.Rev. 893, 895–96 (1973).

6. Since the pleadings do not raise the issue we need not decide if there is also "federal question" jurisdiction on the theory the defendant is an agency of the United States. But we note that if plaintiff's life expectancy is as much as a decade (or less) the "bargain" value of her lease would seem to have a value greater than $10,000.00. 28 U.S.C. § 1331.

Property interests, of course, are not created by the Constitution.[7] Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law —rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

408 U.S. at 577, 92 S.Ct. at 2709.

A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.

Perry v. Sinderman, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Thus we must now look to applicable statutes, governmental regulations, and the custom and understandings of public landlords in the operation of their apartments to determine if a public tenant has a "property interest" in a tenancy beyond the term of the lease except for cause.[8]

When Congress legislated with regard to mortgage insurance benefits which defendant receives, it provided: "The Congress affirms the national goal, as set forth in section 1441 of Title 42, of 'a decent home and suitable living environment for every American family'." 12 U.S.C. § 1701t. This policy of improving the "living environment of urban areas" was also the policy of Congress in enacting the Housing and Urban Development Act of 1965. Pub.L. 89–117, 79 Stat. 451 (Aug. 10, 1965). "This [policy] includes adequate, safe, and sanitary quarters. But it also implies an atmosphere of stability, security, neighborliness, and social justice." McQueen, 317 F.Supp. at 1130. Cf., Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed. 2d 415 (1972).

■ In addition to the policy statements contained in the relevant funding statutes, Congress has also expressed itself in part on how these programs should be run. "No person in the United States shall, on the ground of race, color, or national origin, be excluded

---

7. Indeed, the Court has held with regard to eviction from private housing:

We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality or any recognition of the right of a tenant to occupy the real property of his [wholly private] landlord beyond the term of his lease, without the payment of rent or otherwise contrary to the terms of the relevant agreement.

Lindsey v. Normet, 405 U.S. 56, 75, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972).

8. Expanding notions of "property," sometimes defined as "entitlement," are noted in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970):

It may be realistic today to regard welfare entitlements as more like "property" than a "gratuity." Much of the existing wealth in this country takes the form of rights that do not fall within traditional common-law concepts of property. It has been aptly noted that '[s]ociety today is built around entitlement. The automobile dealer has his franchise, the doctor and lawyer their professional licenses, the worker his union membership, contract, and pension rights, the executive his contract and stock options; all are devices to aid security and independence. Many of the most important of these entitlements now flow from government: subsidies to farmers and businessmen, routes for airlines and channels for television stations; long term contracts for defense, space, and education; social security pensions for individuals. Such sources of security, whether private or public, are no longer regarded as luxuries or gratuities; to the recipients they are essentials, fully deserved, and in no sense a form of charity. It is only the poor whose entitlements, although recognized by public policy, have not been effectively enforced.' Reich, Individual Rights and Social Welfare: The Emerging Legal Issues, 74 Yale L.J. 1245, 1255 (1965). See also Reich, The New Property, 73 Yale L.J. 733 (1964). 397 U.S. at 262 n. 8, 90 S.Ct. at 1017.

from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The policy of this statute, a person's right to be free of invidious discrimination in federally assisted programs, is contained in many statutes, *see, e.g.*, 42 U.S.C. § 2000a.

> This legislative establishment of policy carries significance beyond the particular scope of each of the statutes involved. The policy thus established has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction but also in those of decisional law.

Moragne v. States Marine Lines, Inc., 398 U.S. 375, 390–391, 90 S.Ct. 1772, 1782, 26 L.Ed.2d 339 (1970).[9]

▮ Not only the statutes, but also FHA regulations authorized under 12 U.S.C. § 1701s(f), imply a right to be free from arbitrary and discriminatory action. For example, 24 C.F.R. § 221.536 (1971) provides that a landlord in a § 221(d)(3) apartment may not discriminate against any family because of children.

The House Report dealing with the Housing and Urban Development Act of 1965 said, with regard to the rent supplement program:

> If his income increases sufficiently so that he can pay the full economic rent with 25% of his income, rent supplement payments on his behalf would cease to be made. The tenant could, however, continue to live in the project and would not be required to pay more than the full economic rent.

H.R. Rep. No. 365, 89th Cong., 1st Sess. (1965), 1965 U.S.Code Cong. and Ad. News, pp. 2614, 2618. This suggests the Congress was contemplating more occu-

pancy entitlement than limited leasehold terms.

The tenant's expectation of some degree of permanancy, seemingly shared by the Congress, if not by the landlord, is bolstered by "custom."[10] Just as there may be a "common law" of tenure at a college or university, there may be a common law of tenancy in public housing projects. *See Perry*, 408 U.S. at 602, 92 S.Ct. 2694.

> The actual workings of the subsidized housing program must be examined to determine whether there is a reasonable basis for tenants to expect that in normal circumstances they will be permitted to remain in the housing indefinitely. And indeed one finds that the normal practice in subsidized housing, as in private housing, is to permit tenants to remain beyond the expiration of a lease unless a reason has arisen for eviction; termination is the exception, not the rule. Thus, tenants do have a reasonable expectation deserving of protection.

Note, Procedural Due Process in Government—Subsidized Housing, 86 Harv. L.Rev. 880, 905 (1973).

In view of the congressional policies of providing a decent home (with stability and security) for every American family, and of prohibiting arbitrary and discriminatory action, bolstered by the FHA regulations and custom, we find in the scheme of the National Housing Act and the Housing and Urban Development Act of 1965 a property right or entitlement to continue occupancy until there exists a cause to evict other than the mere expiration of the lease. We therefore hold that the lease provision purporting to give the landlord power to terminate without cause at the expiration of a fixed term is invalid. *Accord*, Rudder v. United States, 226 F.2d 51, 96

---

9. *See also* Note, 82 Yale L.J. 258 (1972).

10. Indeed, early common law provided that even an estate at will could be transformed into an estate similar to a life estate by continuous custom. "This cus-

tom, being suffered to grow up by the lord, is looked upon as the evidence and interpreter of his will: his will is no longer arbitrary and precarious; but fixed and acertained . . . . " 2 Blackstone, Commentaries *147.

U.S.App.D.C. 329 (1955); Brown v. Housing Auth., 340 F.Supp. 114 (E.D. Wisc.1972); *McQueen,* 317 F.Supp. at 1131.

In Caulder v. Durham Housing Auth., 433 F.2d 998 (4th Cir. 1970), cert. denied, 401 U.S. 1003, 91 S.Ct. 1228, 28 L. Ed.2d 539 (1971), we stated:

> The "privilege" or the "right" to occupy publicly subsidized low-rent housing seems to us to be no less entitled to due process protection than entitlement to welfare benefits which were the subject of decision in *Goldberg* or the other right and privileges referred to in *Goldberg.*

433 F.2d at 1003. The court then held tenants entitled to notice, confrontation of witnesses, counsel, and a decision by an impartial decision maker based on evidence adduced at a hearing. 433 F.2d 1004. As stated by the court below, it could be inferred that the plaintiff here was to be evicted for cause. If so, she would be entitled to the same procedural safeguards set forth in *Caulder.* To allow a quasi public landlord to evict upon expiration of a fixed term is to enable secret and silent discrimination and would wholly emasculate the procedural safeguards of *Caulder. See* Robinson v. Diamond Housing Corp., 150 U.S.App. D.C. 17, 463 F.2d 853, 860 (1972). *Cf.* Ohio Bell Tel. Co. v. Public Util. Comm'n, 301 U.S. 292, 302, 57 S.Ct. 724, 81 L.Ed. 1093 (1937).

Indeed, the entitlement of plaintiff to continue occupancy of public housing, like the interest of a covered employee under the Social Security Act, is, we think, "of sufficient substance to fall within the protection from arbitrary governmental action afforded by the Due Process Clause." Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960).[11] A position beyond that espoused in *Flemming* has been urged.

> But that under appropriate circumstances one's interest in his government job, his publicly financed home, his food stamp meals, or his state university educational opportunities may indeed be constitutional rights in the positive-law sense ought no longer be denied.

Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439, 1463–64 (1968). However, in view of our holding that the congressional scheme and custom give plaintiff a right to remain in her apartment we need not decide whether her claim is also protected by equal protection[12] and "substantive" due process.[13]

 Finally we must determine what procedural due process requires by way of protection of plaintiff's right to tenancy except for cause. In Johnson v. Tamsberg, 430 F.2d 1125 (4th Cir. 1970), we noted that the South Carolina eviction scheme requires the landlord to prove in court his allegations, allows trial by jury, and we concluded that "public housing tenants are not actually ejected until basic due process requisites are satisfied." 430 F.2d at 1127.[14]

---

11. See also Slochower v. Board of Higher Educ., 350 U.S. 551, 555–556, 559, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Cafeteria and Restaurant Workers Union v. McElroy, 367 U.S. 886, 898, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Wieman v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Cole v. Housing Auth., 435 F.2d 807 (1st Cir. 1970); Holmes v. New York City Housing Auth., 398 F.2d 262, 265 (2d Cir. 1968); Hornsby v. Allen, 326 F.2d 605 (5th Cir. 1964); Rudder v. United States, 96 U.S.App.D.C. 329, 226 F.2d 51 (D.C. Cir. 1955); McDougal v. Tamsberg, 308 F.Supp. 1212, 1214 (D.S.C.1970); Colon v. Tompkins Square Neighbors, Inc., 294 F.Supp. 134, 138 (S.D.N.Y.1968).

12. See James v. Strange, 407 U.S. 128, 140, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972); Rinaldi v. Yeager, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966).

13. Van Alstyne, *supra* at 1462.

14. The South Carolina scheme is thus unlike that of New York and North Carolina, where eviction in state court is summary in nature and full administrative hearings must be afforded. Caulder v.

That is enough. A prior administrative hearing is not required so long as the tenant may at some stage receive a plenary judicial hearing. 430 F.2d 1127. Since we now hold that a Section 221(d)(3) landlord must before eviction give his tenant a good-cause notice and prove such cause exists, and since the South Carolina eviction procedure is constitutionally adequate, we perceive no reason for retention of jurisdiction in the federal court to consider the question of good cause for eviction. Landlord-tenant law is traditionally the province of the states. State judges are bound as are we by the due process clause of the fourteenth amendment. U.S.Const. art. VI; Glover v. Housing Auth., 444 F.2d 158, 161–62n.4 (5th Cir. 1971); *McQueen*, 317 F.Supp. at 1131.

On remand the district court will enter its decree invalidating the lease expiration clause and enjoining the defendant from attempting to evict the plaintiff except for cause under the procedural and substantive law of South Carolina.

Reversed and remanded.

Durham Housing Auth., 433 F.2d 998, 1002 (4th Cir. 1970); Escalera v. New

York City Housing Auth., 425 F.2d 853
(2d Cir. 1970).