BELVOIR CLIFFS APARTMENTS, LTD. *v.* BEMBRY.

(No. 77-CVG-35489—Decided February 2, 1978.)

Cleveland Municipal Court.

*Mr. Michael H. Peterson,* for plaintiff.
*Mr. Peter M. Iskin* and *Ms. Joyce H. Neiditz,* for defendant.

WILLIAMS, J. This action came on to be heard upon plaintiff's complaint in forcible entry and detainer to recover possession of residential rental premises and defendant's counterclaim to recover damages based on alleged retaliation for tenant organizing activities. A trial was held on the merits of the respective claims and defenses of the parties on January 4, 5 and 6, 1978. On January 17, 1978 this court filed a judgment entry wherein it held defendant not guilty on the complaint; rendered judgment

for defendant on the counterclaim; and awarded defendant nominal damages of $1.00 plus attorney fees of $500.00 plus costs. On January 25, 1978, plaintiff filed a request for findings of fact and conclusions of law pursuant to Rule 52 of the Ohio Rules of Civil Procedure. The findings and conclusions of this court are set forth hereinbelow.

## FINDINGS OF FACT.

*Belvoir Cliffs Apartments and the Section 8 Program.*

1. Plaintiff owns Belvoir Cliffs Apartments (hereinafter "BCA"), a housing project of 160 dwelling units contained in 10 buildings on a site of approximately 9 acres. BCA is located at 2079 Belvoir Boulevard, Cleveland, Ohio.

2. Plaintiff is an Ohio limited partnership which was created for the purpose of acquiring title to and rehabilitating BCA under the federal housing program known as Section 8 Substantial Rehabilitation (hereinafter "Section 8"). (42 U. S. Code Sec. 1437f; 24 C. F. R. Sec. 881.101, *et seq.*)

3. The purpose of the Section 8 program is to aid lower-income families obtain a decent place to live. (42 U. S. Code Sec. 1437f[a].)

4. In December, 1976 plaintiff entered into a Section 8 housing assistance payment contract with the United States Department of Housing and Urban Development (hereinafter "HUD") whereby a rent subsidy was established for 100% of the units at BCA. The contract provides that the tenant's contribution toward rent shall be 25% of the family's net income and that HUD shall pay plaintiff the difference between the contract rent and the tenant's share of the rent. (24 C. F. R. Sec. 881.118.) The contract rents at BCA are $238.00 per month for one-bedroom units and $276.00 per month for two-bedroom units. The housing assistance payments by HUD to plaintiff may continue even though a unit is vacant. (24 C. F. R. Sec. 881.-107[b], [c] and [d].)

5. Receipt of the housing assistance payments is conditioned upon plaintiff's compliance with a myriad of HUD regulations governing nearly all areas of operation of BCA. (24 C. F. R. Sec. 881.101, *et seq.*) The involvement of

the federal government in housing projects receiving the benefits of the Section 8 Substantial Rehabilitation program is no less extensive than its involvement in the earlier federally subsidized housing programs known as 221(d)(3) (12 U. S. Code Sec. 1715z[d][3]), 236 (12 U. S. Code Sec. 1715z-1), and rent supplement (12 U. S. Code Sec. 1701s).

6. Plaintiff's agreement with HUD requires plaintiff to rehabilitate substantially the 160 units at BCA and to make these units available for occupancy by lower-income families. (42 U. S. Code Sec. 1437f[b][2].) The nature of the rehabilitation undertaken and the performance of the rehabilitation is subject to HUD review, inspection and approval. (24 C. F. R. Secs. 881.201 to 881.217.)

7. Plaintiff commenced its substantial rehabilitation of BCA in December, 1976. The rehabilitation is being carried out in ten stages, each building at BCA constituting a separate stage.

8. To carry out this substantial rehabilitation of BCA the buildings had to be vacant. Therefore, between December, 1976, and May, 1977, nearly all the units at BCA were unoccupied.

9. In May, 1977 the early stages of the rehabilitation were completed and plaintiff began leasing units at BCA to tenants eligible for the Section 8 program.

10. As of January 4, 1978, plaintiff was completing rehabilitation of the last two buildings at BCA.

11. Plaintiff has received final approval from HUD to replace its interim financing of the aforementioned rehabilitation with a mortgage insured by HUD under Section 221(d)(4) of the National Housing Act (hereinafter "221(d) (4) program"). (12 U. S. Code Sec. 1715z[d][4]; 24 C. F. R. Sec. 221.1, *et seq.*)

12. The purpose of the 221(d)(4) program is to increase the supply of decent, safe and sanitary housing for low and moderate income families as part of the effort toward realization of the national housing goal of a decent home and suitable living environment for every American family. (42 U. S. Code Secs. 1441 and 1441a; 12 U. S. Code Sec. 1715z; 24 C. F. R. Sec. 221.1, *et seq.*)

13. In receiving the benefits of mortgage insurance under the 221(d)(4) program, plaintiff becomes subject to additional federal regulations and controls. (24 C. F. R. Sec. 221.1, *et seq.*)

*Defendant's Tenancy at BCA—Loss of Income, Contact With Management, Termination of Tenancy.*

14. The management functions at BCA are performed by Melvin Ross, Harvey Oppmann, Richard Lewarn and Diane Walton. Mr. Ross and Mr. Oppmann are the two general partners of Belvoir Cliffs Apartments, Ltd.; Mr. Lewarn is the general property manager at BCA; and Ms. Walton is the resident property manager at BCA.

15. Defendant resides in BCA at 2050 Cliffview Road, Apartment No. 9, Cleveland, Ohio pursuant to a written lease she entered into with plaintiff on August 12, 1977. The lease is for a term of 12 months.

16. The contract rent for defendant's two-bedroom apartment at BCA is $276.00 per month.

17. At the commencement of defendant's occupancy in BCA she was employed by "Our Community Center" and receiving a salary of approximately $100.00 per week.

18. Based on her salary of $100.00 per week, defendant's obligation toward the contract rent was $96.00 per month. The difference between the contract rent and defendant's obligation toward rent was paid by HUD to plaintiff in the form of housing assistance payments.

19. In October, 1977, defendant's salary from "Our Community Center" was terminated and she applied to the Cuyahoga County Department of Welfare (hereinafter "welfare department") for financial assistance to support her family.

20. Defendant was current in her rental obligation to plaintiff through the month of October, 1977, at the time her salary was terminated.

21. In the latter part of October, 1977, and on November 1, 1977, defendant informed Diane Walton, the person responsible for receiving the rent payments of tenants at BCA, of her financial predicament, that is, her loss of income and application to the welfare department.

22. On November 7, 1977, defendant personally delivered to Diane Walton a written notice from the welfare department. The notice was dated November 7, 1977, and it advised BCA that defendant had applied for assistance under the ADC program. The notice further advised BCA that defendant would not receive her first check until between November 24, 1977, and December 3, 1977.

23. During the above described contacts between defendant and Diane Walton, defendant informed Ms. Walton that her loss of income would preclude her from tendering rent for November, 1977, until she received her ADC payment from the welfare department. Further, defendant requested Ms. Walton to recompute the amount of defendant's rental obligation on the basis of her reduced income.

24. Diane Walton's response to defendant during the above described contacts was as follows:

a) She expressed gratification to defendant for informing her of the financial problem, and particularly for bringing to her the notice from the welfare department.

b) She assured defendant that her tenancy at BCA would not be in jeopardy as long as defendant paid her rent for November when she obtained her welfare assistance.

c) She generally discouraged defendant from pursuing the subject of rent recomputation.

25. At no time did Diane Walton advise defendant that recomputation of defendant's rental obligation would require further documentation of income or any other action by defendant.

26. On November 16, 1977, Richard Lewarn served upon defendant a notice of termination pursuant to Section 1923.04 of the Ohio Revised Code by leaving said notice at defendant's apartment.

27. Defendant received the notice of termination on November 16, 1977, and immediately telephoned the BCA management office and spoke with Diane Walton. Defendant asked Ms. Walton to explain the course of action defendant could undertake to effect a rescission of the

termination notice. Contrary to her earlier statements to defendant, Ms. Walton told defendant that the November rent must be paid by November 19, 1977.

28. On November 18, 1977, defendant went to the BCA management office to discuss her rent situation. Diane Walton informed defendant that unless she was able to tender payment for November's rent there was no reason to discuss the matter with Mr. Ross or Mr. Lewarn.

29. As of November 18, 1977, defendant had not received her ADC payment and she had no other source of funds to pay the rent for November, 1977.

30. Relying on Ms. Walton's statement of November 18, 1977, defendant did not contact BCA management again until on or about November 28, 1977.

31. On or about November 28, 1977, defendant received her ADC check and tendered her November rent at the BCA management office. Diane Walton, under the instruction of Richard Lewarn, refused to accept defendant's tender of November rent. This same day defendant sent a money order in the amount of her November rent to BCA management by certified mail, but it was refused and returned to defendant.

*Defendant's Involvement with the Tenant Association at BCA.*

32. Defendant was an active participant in tenant organizing activities at BCA. Defendant and a few other tenants met on October 13, 1977, to explore whether they wanted to form a tenant organization. At this meeting, Phil Star, a representative of the Cleveland Tenant Organization, explained the rights and responsibilities of tenants relative to tenant organizing.

33. Tenant organization meetings were subsequently held on October 20, 1977, and November 1, 1977. Defendant was the chairperson at one meeting and part of the leadership nucleus of the tenant organization movement. Cecelia Flonnoy, a sister of defendant and a resident of BCA, was the de facto head of the tenant organization. Betty Flonnoy, the mother of defendant, was also part of the tenant organization leadership.

34. The primary concern of the tenant organization was to improve security at BCA. Other matters of concern to the tenant organization included, but were not limited to, inadequate garbage removal, extermination and exterior lighting.

35. On or about November 4, 1977, a meeting was held at the Cleveland HUD Office for the purpose of discussing the concerns of the tenants at BCA. Plaintiff was represented at this meeting by Mr. Ross, Mr. Oppmann and Mr. Lewarn. The tenants were represented by Cecelia Flonnoy, Betty Flonnoy and Phil Star. In addition, there were numerous HUD personnel in attendance. It was agreed by all present at this meeting that the tenant organization would put their concerns in writing and forward them to plaintiff who, in turn, would provide the tenant organization a written response.

36. Defendant, Cecelia Flonnoy, and a few other tenants circulated petitions at BCA which expressed the concerns of the tenant organization. These petitions were signed by a substantial number of tenants of BCA and then sent to Mr. Oppmann along with additional material which explained the position of the tenant organization. Copies of these petitions and the supplemental materials were also sent to HUD.

37. On or about November 17, 1977, Mr. Oppmann forwarded to the tenant organization a written response.

38. By November 4, 1977, if not sooner, plaintiff was aware of defendant's participation in the tenant organization and her relationship to Cecelia Flonnoy and Betty Flonnoy.

*General Rent Collection Policy and Rent Recomputation Policy at BCA—Failure to Apply to Defendant; Finding of Retaliation.*

39. Plaintiff's rent collection policy at BCA generally takes into account the peculiar problems of lower-income families.

a) Although the leases at BCA provide that rent is to be paid on the first day of each month, plaintiff accords the tenants a ten-day grace period. This practice was

adopted in recognition of the fact that many of the tenants at BCA are dependent on governmental checks—ADC, Social Security, etc.—and that the delivery of those checks does not occur until after the first day of the month.

b) Further, plaintiff's rent collection policy permits tenants to pay their rents subsequent to the 10th day of the month in the event a tenant incurs personal or financial problems such as a sick mother or a strike at work. There were numerous instances of tenants at BCA paying rent after the 10th day of the month during the months of September through December, 1977, pursuant to this policy. Indeed, many of these rent payments were tendered after the 16th day of the month and in one instance after the beginning of the subsequent month.

40. If plaintiff had applied to defendant the same rent collection policy it generally used for the other tenants at BCA, the instant eviction action would not have been instituted and plaintiff would have accepted defendant's tender of rent for November, 1977.

41. Plaintiff was timely notified of defendant's unexpected loss of income, but nevertheless refused to treat defendant in the same manner it treated other tenants at BCA who incurred unexpected financial problems.

42. Recomputation of a tenant's rental obligation at BCA due to a reduction in the family's income is a simple process. Upon verification of the tenant's change in income, it takes a few hours or less to complete the requisite forms.

43. In the middle of October, 1977, one tenant at BCA requested a rent recomputation due to a decrease in income and his rental obligation was changed effective November, 1977.

44. Plaintiff retaliated against defendant because of her tenant organization activities. The retaliation is evidenced by, among other things, plaintiff's failure to inform defendant accurately of the rent recomputation procedure; plaintiff's attempt to discourage defendant from pursuing a rent recomputation; plaintiff's failure to effect a rent recomputation for defendant at least by December,

1977; and, most importantly, plaintiff's failure to apply in the case of defendant the same rent collection policy as is used for other tenants at BCA.

45. The Court finds that plaintiff filed the instant case in retaliation against defendant for engaging in tenant organization activities at BCA.

46. The Court finds that defendant has suffered only nominal damages as a result of this retaliatory eviction action. This finding is based upon the premise that defendant's rental obligation will be recomputed to reflect her reduced income and this newly determined rental obligation will be effective from December 1, 1977.

37. The Court finds that there did not exist good cause to terminate defendant's tenancy at BCA.

48. Based on the pleadings and briefs submitted by defendant, particularly the extensive trial brief regarding the complex federal housing program at BCA and the constitutional issues resulting therefrom, and the 3 days of trial, the court finds that defendant's attorneys are entitled to attorney fees in the amount of $500.00.

*CONCLUSIONS OF LAW.*
*Applicability of the United States Constitution at BCA.*

1. The constraints of the First and Fifth Amendments to the United States Constitution do not apply to purely private behavior. *McQueen* v. *Druker* (D. Mass. 1970), 317 F. Supp. 1122, 1127.

2. The Supreme Court has never established an absolute test for determining whether a private person's conduct has become so intertwined with the government that it constitutes "government action"; instead the court has stated that "only by sifting facts and weighing circumstances can the nonobvious involvement of the state in private conduct be attributed its true significance." *Burton* v. *Wilmington Parking Authority* (1961), 365 U. S. 715, 722; *Moose Lodge No. 107* v. *Irvis* (1972), 407 U. S. 163, 172.

3. Many federal and state courts have found a sufficient relationship between the government and private landlords of federally subsidized housing projects to bring

their actions within the scope of constitutional restraints, *e. g., Joy* v. *Daniels* (C. A. 4, 1973), 479 F. 2d 1236; *Lopez* v. *Henry Phipps Plaza South, Inc.* (C. A. 2, 1974), 498 F. 2d 937; *Geneva Towers Tenants Organization* v. *Federated Mortgage Investors* (C. A. 9, 1974), 504 F. 2d 483; *Anderson* v. *Denny* (W. D. Va. 1973), 365 F. Supp. 1254; *Short* v. *Fulton Redevelopment Co., Inc.* (S. D. N. Y. 1975), 390 F. Supp. 517; *McQueen* v. *Druker, supra*; *Prevo* v. *National Corporation for Housing Partnerships*, Civil Action C76-104A (N. D. Ohio, June 3, 1976), *Green* v. *Copperstone Limited Partnership* (1975), 28 Md. App. 498, 346 A. 2d 686; *Appel* v. *Beyer* (1974), 39 Cal. App. 3d Supp. 7, 114 Cal. Rptr. 336; *Ivywood Apartments* v. *Bennett* (1976), 51 Ohio App. 2d 209.

4. Inasmuch as the involvement of the federal government is no less in the Section 8 Substantial Rehabilitation program than in the federally subsidized housing programs which triggered First and Fifth Amendment protection in *Geneva Towers Tenant Organization, Anderson, McQueen, Short, Green* and *Appel*, this court concludes that plaintiff's actions fall within the ambit of federal government action for purposes of the First and Fifth Amendments to the United States Constitution.

5. With the additional federal government involvement at BCA resulting from the 221(d)(4) mortgage, the relationship of HUD to BCA far exceeds the symbiotic relationship required by *Burton.*

6. An alternative basis for concluding that plaintiff's actions are subject to the same constitutional restraints as apply to the federal government derives from the public function concept. *Marsh* v. *Alabama* (1946), 326 U. S. 501. Public housing has traditionally been a function of federal and state government. (42 U. S. Code Sec. 1401 [Supp. 1974]; 42 U. S. Code Sec. 1441; 12 U. S. Code Sec. 1701t.) That private landlords have been induced to assist in the providing of housing for low-income persons subject to pervasive regulatory schemes does not alter this fact. *McClellan* v. *University Heights, Inc.* (D. R. I. 1972), 338 F. Supp. 374; *Anderson* v. *Denny, supra*; *McQueen* v. *Druker, supra*;

*Appel* v. *Beyer, supra.* The Section 8 Substantial Rehabilitation housing project is providing a service (public housing) that from its inception was solely the responsibility of the federal, state and local governments.

*First Amendment Prohibition against Retaliatory Evictions*

7. Having concluded that BCA is subject to the same constitutional constraints as apply to the federal government, it must follow that plaintiff's power to evict is limited at least to the extent that it may not evict a tenant for engaging in constitutionally protected activities. *Thorpe* v. *Housing Authority of City of Durham* (1969), 393 U. S. 268, 283.

8. Tenant association and organizing activities are actions embraced by the First Amendment. *McQueen* v. *Druker, supra.*

9. By instituting the instant case and refusing to accept defendant's tender of rent in retaliation for defendant's tenant organization activities at BCA, plaintiff has attempted to evict defendant for exercising her First Amendment liberties. Therefore, this court concludes that plaintiff's complaint in forcible entry and detainer is an illegal action and that the defendant is not guilty on the complaint.

*Fifth Amendment Prohibition against Termination of Tenancy at BCA without Good Cause.*

10. To invoke the due process clause of the Fifth Amendment to the United States Constitution there must be a liberty or property interest involved in addition to "government action." *Goldberg* v. *Kelly* (1970), 397 U. S. 254; *Board of Regents* v. *Roth* (1972), 408 U. S. 564; *Perry* v. *Sindermann* (1972), 408 U. S. 593.

11. After *Goldberg* v. *Kelly* the courts have consistently held that tenants of conventional public housing have a property interest in continued occupancy. *Caulder* v. *Durham Housing Authority* (C. A. 4, 1970), 433 F. 2d 998, *cert. denied,* 401 U. S. 1003 (1971); *Escalera* v. *New York City Housing Authority* (C. A. 2, 1969), 425 F. 2d 853, *cert. denied,* 400 U. S. 853 (1970). Likewise the courts have found that tenants in privately owned, federally subsidized

48

housing have a property interest in their tenancies. *Joy* v. *Daniels, supra*; *Lopez* v. *Henry Phipps Plaza South, Inc., supra*; *Anderson* v. *Denny, supra*; *Prevo* v. *National Corporation for Housing Partnerships, supra.*

12. In the leading case of *Joy* v. *Daniels*, the Fourth Circuit applied the principles enunciated in *Goldberg, Roth* and *Sindermann* to a privately owned, federally subsidized housing project and held that the tenants have a property interest in continued occupancy. The Court noted the Congressional intent to provide a "decent home and suitable living environment for every American family" (12 U. S. Code Sec. 1701t) and to provide "an atmosphere of stability, security, neighborliness and social justice." *Joy* at 1240, quoting *McQueen* v. *Druker, supra,* at 1130. In addition, the court referred to HUD regulations barring discrimination and arbitrary treatment of tenants in the particular housing project. Finally, the court stated that the "tenant's expectation of some degree of permanency, seemingly shared by the Congress, if not by the landlord, is bolstered by 'custom.' Just as there may be a 'common law' of tenure at a college or university, there may be a common law of tenancy in public housing projects." *Joy* at 1241. Thereupon, the court found that tenancies in federally subsidized housing programs cannot be terminated without good cause as a matter of federal law and that this reasonable expectation to continued entitlement is protected by the due process clause.

13. The reasoning of the court in *Joy* v. *Daniels* is equally applicable to the Section 8 Substantial Rehabilitation program, and in particular to BCA. The federal legislation—the Housing and Community Development Act of 1974—creating the Section 8 program states in part:

"It is the policy of the United States to promote the general welfare of the nation [by assisting] several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income * * *." (42 U. S. Code Sec. 1437.)

Section 8(a) of the Act states that payments under

Section 8 will be made "for the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing * * *." (42 U. S. Code Sec. 1437f[a].) These statutory goals are almost identical to the housing goals under consideration by the Court in *Joy*, and similar rights to entitlement can be inferred from the statutes. Congressional intent in this regard is further evidenced by the fact that a tenant can continue to live in the unit even if his income increases to the point that the rent subsidy ceases. (24 C. F. R. Sec. 881.102 (definition of Eligible Family).) "This suggests that Congress was contemplating more occupancy entitlement than limited leasehold terms." *Joy* at 1236 (dealing with similar provisions of Section 221(d)(3) housing program). The second component of the *Joy* analysis, freedom from certain arbitrary and discriminatory practices, is also present in the Section 8 program. (42 U. S. Code Sec. 2000[d]; 24 C. F. R. Sec. 881.219[c]; 24 C. F. R. Part 881, Appendix II [2.1].) The final factor considered by *Joy* is custom and practice. As was the case in the *Joy* housing project, the general policy at BCA is to permit a tenancy to continue until and unless there is good cause to terminate it.

14. Therefore, like his counterpart in the earlier federally subsidized housing programs, a tenant residing in a Section 8 Substantial Rehabilitation housing project, and in particular at BCA, has a property interest in continued occupancy. And the due process clause of the Fifth Amendment to the United States Constitution prohibits termination of this entitlement unless good cause is shown.

15. The circumstances regarding defendant's payment of rent for November, 1977, did not constitute good cause to terminate defendant's tenancy at BCA. This conclusion serves as an independent basis, apart from the First Amendment defense of retaliatory eviction, to hold that defendant is not guilty on the Complaint in forcible entry and detainer.

*Counterclaim Under R. C. 5321.02.*

16. If a landlord brings an eviction action against a

tenant because the tenant has engaged in tenant association activities, R. C. 5321.02 authorizes the tenant, among other things, to use the retaliation of the landlord as a defense to the eviction action and/or to bring an action against the landlord to recover actual damages together with reasonable attorney fees.

17. R. C. 5321.03(A) permits a landlord to bring an eviction action notwithstanding his violation of R. C. 5321.-02 if one or more of the circumstances enumerated in R. C. 5321.03(A) are applicable. However, R. C. 5321.03(A) does not affect the right of a tenant to bring an action for damages and attorney fees pursuant to R. C. 5321.02.

18. Plaintiff brought the instant action in forcible entry and detainer against defendant because of her tenant association activities and, therefore, in violation of R. C. 5321.02. Consequently, defendant is entitled under R. C. 5321.02 to recover from plaintiff actual damages plus attorney fees regardless of whether or not defendant was in default in the payment of her rent within the meaning of R. C. 5321.03(A)(1).

*Judgment accordingly.*