OPINION OF THE COURT
Sue Ann Hoahng, J.
This is a holdover proceeding brought on by the landlord, the City of New York (hereinafter City). The tenant defaulted *135 in appearance on June 2, 1997. Consequently, an inquest was held on June 16, 1997. The court notified the tenant of the inquest date by postcard but the tenant did not appear on that date as well.
The City seeks to evict the tenant for holding over after the month-to-month tenancy was supposedly terminated by delivery to the tenant of a 30-day notice to terminate tenancy pursuant to Real Property Law § 232-a. The apartment in question is located in a building acquired by the City as the result of an in rem tax foreclosure. The City provided no reason for its decision to terminate the tenancy, either in its notice, in its petition, or at the inquest. The City asserts that it should have the unbridled discretion to terminate a tenancy.
Until recently, the City itself embraced the well-settled notion that although landlords in the private sector may terminate month-to-month and monthly tenancies without cause, governmental entities, including itself, are barred from doing so by the Fourteenth Amendment of the US Constitution. Last year, however, in dicta, and contrary to the City’s own posture on the matter, the Appellate Term mused that the City might not need to afford due process protection to tenants of buildings that were acquired through in rem tax foreclosure. The court stated: "Despite the City’s concession on this point, this Court is not persuaded that a month-to-month tenant in a building acquired by the City as a result of a tax foreclosure has a right to continued occupancy unless good cause for eviction be shown. In this regard, it is noted that the entitlement to continued occupancy traces to the case of Joy v. Daniels (479 F.2d 1236). In that case, the court derived the entitlement from a 'customs’ not to evict tenants in government-sponsored housing except for cause and from the scheme of the federal housing statutes, from which it inferred a right to continued occupancy. Neither of these grounds have been shown to be applicable when the housing in question was acquired by the City not for the purpose of providing subsidized housing for the needy but as a result of a tax foreclosure. However, in view of the City’s concession that grounds for removal must be shown, we do not decide the case on this ground. Rather, we hold that the evidence adduced at trial adequately established a prima facie case of objectionable conduct on the part of [the] tenant justifying [the] tenant’s removal” (City of New York v Hand, NYLJ, Mar. 14, 1996, at 29, cols 3-4 [App Term, 2d Dept]). The City has since grown fickle. Now it no longer concedes that good cause for removal of a tenant must *136 be shown. It invites this court to accede to its new-found point of view. This I decline to do for the reasons given below.
The City seeks to distinguish the relationship it has with tenants who live on property acquired through tax foreclosure as compared with those landlord-tenant relationships that arise when a government agency purposefully and from the start has set out to provide housing to citizens, such as in public housing projects. In cases like this one, however, the City prefers to be viewed as a reluctant landlord, and as such, it urges this court to allow it the latitude to behave as arbitrarily and capriciously as any private landlord would be so allowed in a similar situation.*
Yet the distinction appears to be illusory. The City is not bound to take over and manage a residential property for long periods of time upon a taxpayer’s default in the payment of property and water taxes. The City is free to pursue other options and it often does so. For example, the City can (and does) assign tax liens to private entities, giving those entities the right to foreclose on the property as well. In the alternative, the City can foreclose and then sell a property outright. Recently the New York Times contained an article describing the sale of 39 City-owned, tax foreclosed properties to private investors. (See, For Sale by City: 39 of Its Walk-Ups, NY Times, June 22, 1997, section 9 [Real Estate], at 1.) The point is that by taking ownership and control of an existing property and then retaining that control, sometimes for decades, the City’s "purpose” appears to be not that much different from the purpose of any other type of governmental landlord — to provide and maintain housing.
In the Hand opinion (NYLJ, Mar. 14, 1996, at 29, col 3 [App Term, 2d Dept], supra), the court stated that a tenant’s alleged property interest and consequential right to due process traces to Joy v Daniels (479 F2d 1236 [4th Cir 1973], supra). The Joy court pointed out that a " 'person’s interest in a benefit is a "property” interest for due process purposes if there are such rules or mutually explicit understandings that support his *137 claim of entitlement to the benefit and that he may invoke at a hearing.’ ” (Supra, at 1240.) The same court went on to say that "we must now look to applicable statutes, governmental regulations, and the custom and understandings of public landlords in the operation of their apartments to determine if a public tenant has a 'property interest’ in a tenancy beyond the term of the lease except for cause.” (Supra, at 1240.)
A reading of the section of the Administrative Code of the City of New York that prescribes the procedure to be followed by the City in an in rem tax foreclosure strongly suggests that the City may only evict a tenant for cause. The second paragraph of Administrative Code § 11-412 (b) states: "If the city serves a tenant in possession of a dwelling unit with notice of termination of tenancy on grounds other than non-payment of rent, the acceptance of rent for the first forty-five days after termination of tenancy by anyone other than an employee of the department designated by the department to receive such rent shall not be deemed or construed as a waiver of the city’s right to initiate and prosecute a proceeding to terminate the tenancy for good cause.” (Emphasis added.) The inescapable conclusion one reaches from reading the above paragraph is the City must put forth "grounds” for a termination of tenancy and that such termination must be for "good cause.”
In addition, before the Hand decision (supra) altered the City’s view on the issue, and according to Hand, the City conceded that good cause must be shown for an eviction of a month-to-month tenant. This in itself is an indicator that it was the custom and understanding, at least at one time, that tenants of the City may not be evicted without cause. Indeed, the Joy court stated: " 'The actual workings of the subsidized housing program must be examined to determine whether there is a reasonable basis for tenants to expect that in normal circumstances they will be permitted to remain in the housing indefinitely. And indeed one finds that the normal practice in subsidized housing, as in private housing, is to permit tenants to remain beyond the expiration of a lease unless a reason has arisen for eviction; termination is the exception, not the rule. Thus, tenants do have a reasonable expectation deserving of protection.’ ” (Supra, at 1241.) This court takes notice of the fact that tenants of the City have frequently been permitted to remain in possession of their apartments for years and even decades after foreclosure and that eviction of such tenants has not normally been attempted except for good cause. Moreover, other governmental agencies functioning as landlords within *138 this region may not evict tenants without cause. This too may validly be viewed as an expression of presently existing policy and custom.
Appellate decisional law also provides a strong basis for rejecting the City’s posture. In 157 W. 123rd St. Tenants Assn. v Hickson (142 Misc 2d 984 [App Term, 1st Dept 1989]), the court held that where a tenant’s association managed an in rem building under the City’s supervision pursuant to a tenant interim lease (TIL) program, there was sufficient governmental "entwinement” to trigger Fourteenth Amendment protection. The Hickson court said, "While the TIL program is transitory in nature, the city oversees petitioner’s activities and operation, monitors its building management skills, sets initial rents and approves subsequent rent increases * * * Thus, the City is so 'entwined’ * * * as to constitute significant and meaningful governmental participation, triggering constitutional due process guarantees”. (Supra, at 985 [citations omitted].) Just as in Hickson, the building involved in this case was acquired through an in rem tax foreclosure. The only significant difference between the facts of that case and this is that here the City does not manage the property through an agent, but rather, the City manages the property itself. It follows that if management by an agent is sufficient to trigger due process protection, then outright management by the self-same governmental entity under similar conditions is certainly sufficient to trigger the same protection. (See also, Matter of Johnson v City of New York, 192 AD2d 352 [1st Dept 1993] [in modifying the State Supreme Court’s direction to promulgate formal rules for renting vacant apartments in a City-owned building managed under a TIL program, the Court indicated that due process protection was nonetheless required].)
Also, in a case often cited by the City to rebut claims that its petitions are not sufficiently particularized, the Appellate Division stated as a basic premise the proposition that the City may not evict without cause. (City of New York v Valera, 216 AD2d 237 [1st Dept 1995].) The case involved accusations of illegal drug transactions and loitering in a City-owned building. Within the context of holding that the City need not provide in its petition the dates and times of the alleged offending acts by the tenant, the Appellate Division said that "a governmental landlord must notify a tenant of the alleged cause for termination”. (Supra, at 238.)
Lord Acton once commented pithily that "Power tends to corrupt and absolute power corrupts absolutely.” The Constitu *139 tion was designed mainly to place constraints on the exercise of unbridled power and human failings within the context of government. If it should come to pass that the City need no longer evict for good cause, then there will no longer exist any institutionalized protection against abuse of power by the City as landlord. In fact, given the tendency of power to corrupt, the reverse would be the case. I have no doubt that the governance of this City is carried on, for the most part, by honorable people seeking honorable goals. Yet that is not to say, for example, that it could never come to pass that a manager of a City-owned building might instigate the eviction of a tenant who had the temerity to argue vigorously with that manager about a perceived lack of service; or that a changed administration might seek to favor an ally with tenancy or punish a political enemy with eviction; or that an agency head might one day decide that a "purpose” of the City’s taking control of a foreclosed property — for instance, to maintain the housing stock or to supplement the shelter system — no longer applied and is to be supplanted by a new "purpose” — such as to put the property to its highest revenue-producing use. Without the protection of the Fourteenth Amendment, tenants of the City, many of whom are poor and thus without the alternative means to protect themselves, could find their tenancies subject solely to the whim of their own government.
Accordingly, this case is dismissed without prejudice. The landlord has failed to provide the tenant with an effective predicate notice of termination and an adequate petition.

 It is noteworthy that when a building is in receivership — a situation that could be considered a private sector analog to government tax foreclosure, the courts have not allowed the receiver to abrogate the rights of tenants, notwithstanding the different "purpose” of the new "landlord.” (See, e.g., Fourth Fed. Sav. Bank v 32-22 Owners Corp., 236 AD2d 300 [in a foreclosure proceeding, receiver has the same duty as a landlord to maintain the premises in a habitable condition].)